STATE OF CONNECTICUT *v.* BETHZAIDA PADUA

STATE OF CONNECTICUT *v.* WILFREDO CALVENTE

STATE OF CONNECTICUT *v.* MIRANDA
VIRGILIA CALVENTE
(SC 16915)
(SC 16916)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 8, 2004—officially released March 29, 2005

*Michele C. Lukban*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, *Mark A. Stabile*, supervisory assistant state's attorney, and *Vincent Dooley* and *Roger Caridad*, senior assistant state's attorneys, for the appellant in Docket No. SC 16915, appellee in Docket No. SC 16916 (state).

*Moira L. Buckley*, assistant public defender, for the appellee in SC 16915, appellant in SC 16916 (defendant Miranda Virgilia Calvente).

*Richard W. Callahan*, special public defender, for the appellee in SC 16915 (defendant Bethzaida Padua).

*Sol E. Mahoney*, special public defender, for the appellee in SC 16915 (defendant Wilfredo Calvente).

*Opinion*

SULLIVAN, C. J. This case involves two separate appeals. In the first, the state appeals, upon our grant

of certification,[1] from the judgment of the Appellate Court reversing the convictions of the defendants Beth-zaida Padua, Wilfredo Calvente and Miranda Virgilia Calvente (Miranda Calvente) of the crimes of conspiracy to sell marijuana within 1500 feet of a public housing project and risk of injury to a child. The state claims that the Appellate Court improperly concluded that: (1) the evidence was insufficient to sustain the defendants' convictions of risk of injury to a child because the state failed to introduce expert testimony to establish that the ingestion of raw marijuana is injurious to a child's physical health and because there was no testimony that the children were unsupervised in the presence of the marijuana; and (2) the defendants' convictions for conspiracy to sell marijuana within 1500 feet of a public housing project must be reversed because of instructional error. We agree with the state on both claims and reverse the judgment of the Appellate Court in each case.[2]

In the second appeal, Miranda Calvente appeals, upon our grant of certification,[3] from the judgment of the

[1] We granted certification limited to the following issues: "1. Did the Appellate Court properly conclude that there was insufficient evidence of the crime of risk of injury to a child? 2. Did the Appellate Court properly reverse the convictions of the defendants on count five, conspiracy to sell a controlled substance within 1500 feet of a public housing project, for instructional error?" *State* v. *Padua*, 262 Conn. 941, 942, 815 A.2d 672 (2003).

[2] We also agree with the claim that, if we reinstate the defendants' conspiracy convictions, sentencing the defendants both for conspiracy to sell marijuana and conspiracy to sell marijuana within 1500 feet of a public housing project would violate the double jeopardy clause of the United States constitution. Accordingly, we remand the cases to the Appellate Court with direction to remand the cases to the trial court with direction to combine each defendant's two conspiracy convictions, to vacate the respective sentences for conspiracy to sell marijuana and to sentence each defendant only on the respective convictions of conspiracy to sell marijuana within 1500 feet of a public housing project.

[3] We granted certification limited to the following issue: "Did the Appellate Court properly decline to review the claim of the defendant Miranda Virgilia Calvente, that there was insufficient evidence to convict her of conspiracy to sell marijuana within 1500 feet of a public housing project and conspiracy

Appellate Court, claiming that the court improperly declined to review her claim that the evidence was insufficient to convict her of conspiracy to sell marijuana within 1500 feet of public housing project because it already had reversed that conviction because of instructional error. We agree that the Appellate Court improperly declined to review her insufficiency claim, but conclude that the state presented sufficient evidence to support her conviction.

As set forth by the Appellate Court, the jury could have reasonably found the following facts. "In 1999, the Willimantic police department was investigating marijuana trafficking at 171 Cameo Drive, an apartment in the Village Heights Apartments, a federally subsidized multifamily housing project. The police, with the assistance of a confidential informant, effectuated 'controlled buys' of marijuana from 171 Cameo Drive. Before each buy, the police met with the informant, searched his vehicle for money, narcotics and weapons, and provided him with prerecorded money with which to purchase the marijuana. During one of the buys, the police followed the informant to the apartment and observed him go to the door and make a purchase. The next day, the police executed a search warrant for 171 Cameo Drive. Upon entering the apartment, the police observed marijuana on the kitchen table in the process of being packaged for sale. The police also found marijuana in different locations throughout the apartment totaling 10.41 ounces and a large amount of money in the purse of the defendant Miranda Calvente. The defendants were all present in the apartment as well as the defendant Padua's two children, ages seven and three. The children were found in the kitchen where marijuana was being packaged on the table near some

to sell marijuana, on the ground that it had reversed her convictions of those offenses for instructional error." *State* v. *Padua*, 262 Conn. 941, 815 A.2d 672 (2003).

cereal boxes, and some marijuana was seen on the floor under the table. Both Miranda Calvente and Padua were with the children in the kitchen, and Wilfredo Calvente was apprehended as he was attempting to leave the apartment through the kitchen."[4] *State* v. *Padua*, 73 Conn. App. 386, 390–91, 808 A.2d 361 (2002). Additional facts will be set forth as necessary.

The defendants were charged with: (1) possession of marijuana with intent to sell in violation of General Statutes §§ 53a-8[5] and 21a-277 (b);[6] (2) possession of more than four ounces of marijuana in violation of General Statutes §§ 53a-8 and 21a-279 (b);[7] (3) possession of marijuana with intent to sell within 1500 feet of a public housing project in violation of General Statutes §§ 53a-8, 21a-277 (b) and 21a-278a (b);[8] (4) conspiracy to sell marijuana in violation of General Statutes §§ 53a-

---

[4] Wilfredo Calvente and Padua are the children's parents and Miranda Calvente is Wilfredo Calvente's mother and the children's grandmother.

[5] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[6] General Statutes § 21a-277 (b) provides in relevant part: "Any person who . . . possesses with intent to sell or dispense . . . any controlled substance . . . may, for the first offense, be fined not more than twenty-five thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned . . . ."

[7] General Statutes § 21a-279 (b) provides in relevant part: "Any person who possesses or has under his control . . . four ounces or more of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than five years or be fined not more than two thousand dollars or be both fined and imprisoned . . . ."

[8] General Statutes § 21a-278a (b) provides in relevant part: "Any person who violates section 21a-277 or 21a-278 by . . . possessing with the intent to sell or dispense . . . to another person any controlled substance in or on, or within one thousand five hundred feet of . . . a public housing project . . . shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. . . ."

48[9] and 21a-277 (b); (5) conspiracy to sell marijuana within 1500 feet of a public housing project in violation of §§ 53a-48, 21a-277 (b) and 21a-278a (b); and (6) two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1).[10] The three defendants were tried jointly before a jury.[11] Wilfredo Calvente was found guilty of all charges. Padua and Miranda Calvente were found guilty of all charges except possession of more than four ounces of marijuana.

The defendants appealed from the judgments of conviction to the Appellate Court, which reversed the defendants' convictions of two counts of risk of injury to a child on the ground that there was insufficient evidence and ordered the trial court to render judgments of acquittal on those charges. *State* v. *Padua*, supra, 73 Conn. App. 399. The Appellate Court also reversed the defendants' convictions of conspiracy to sell marijuana within 1500 feet of a public housing project because of instructional error and remanded the matter to the trial court for a new trial on that charge. Id., 404. The Appellate Court declined to address Miranda Calvente's claim that the state had presented insufficient evidence to convict her of conspiracy to sell

[9] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[10] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

[11] Benjamin Calvente, Miranda Calvente's son and Wilfredo Calvente's brother, was similarly charged and tried with the defendants. The jury acquitted him of all charges.

marijuana within 1500 feet of a public housing project, reasoning that it had already reversed that conviction because of instructional error. Id., 415 n.9. These certified appeals followed.

## I

We first address the state's appeal. The state claims that the Appellate Court improperly reversed the defendants' convictions under § 53-21 (1) because the state failed to present expert testimony concerning the possible injurious effects of the oral consumption of marijuana and direct testimony concerning the extent of the children's supervision while in close proximity to the marijuana.[12] We agree with the state that neither type of evidence was required.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Garner*, 270 Conn. 458, 472, 853 A.2d 478 (2004). "This does not require that each subordinate conclusion

---

[12] Although the Appellate Court opinion states that the defendants conceded that their insufficiency claims were unpreserved; *State* v. *Padua*, supra, 73 Conn. App. 391; the defendants maintain that they made no such concession and our review of the record reveals that all three defendants preserved their insufficiency claims in their respective motions for judgment of acquittal at the end of the state's case-in-chief. Therefore, these claims are properly preserved for our review.

established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) Id.

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) Id., 472–73.

General Statutes (Rev. to 1999) § 53-21 provides in relevant part that "[a]ny person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, *or* does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony." (Emphasis added.) "The general purpose of § 53-21 is to protect the physical and psychological well-being of children from the potentially harmful conduct of adults." *State v. Payne*, 240 Conn. 766, 771, 695 A.2d 525 (1997). Our case law has interpreted § 53-21 (1) as comprising two

distinct parts and criminalizing "two general types of behavior likely to injure physically or to impair the morals of a minor under sixteen years of age: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the minor and injurious to his moral or physical well-being." (Citation omitted; internal quotation marks omitted.) *State* v. *Dennis*, 150 Conn. 245, 250, 188 A.2d 65 (1963). Thus, the first part of § 53-21 (1) prohibits the creation of *situations* detrimental to a child's welfare, while the second part proscribes injurious *acts* directly perpetrated on the child. In the present matter, we are concerned only with the first portion of § 53-21 (1), relating to the creation of detrimental situations.

Under the "situation" portion of § 53-21 (1), the state need not prove actual injury to the child. Instead, it must prove that the defendant wilfully created a situation that posed a risk to the child's health or morals. See generally *State* v. *Payne*, supra, 240 Conn. 771–76; *State* v. *Apostle*, 8 Conn. App. 216, 242–43, 512 A.2d 947 (1986). The situation portion of § 53-21 (1) "encompasses the protection of the body as well as the safety and security of the environment in which the child exists, and for which the adult is responsible." *State* v. *Payne*, supra, 774.

In the present matter, the informations charged that the defendants did "wilfully and unlawfully cause and permit a child under the age of sixteen . . . to be placed in a situation where [his or her] health was likely to be impaired, to wit, by allowing said child to be near and have access to large quantities of marijuana in violation of General Statutes [§] 53-21 (1)." Because the "state is limited to proving that the defendant has committed the offense in substantially the manner described" in the information; (internal quotation

marks omitted) *State* v. *Kyles*, 221 Conn. 643, 650, 607 A.2d 355 (1992); the state in this case had to prove that the defendants created a *situation* likely to injure the *health* of the children and could not proceed under the endangerment of life or limb or the impairment of morals provisions of the situation portion of the statute.

## A

The first part of the state's claim requires us to determine whether the Appellate Court improperly held that the state was required to present expert testimony to establish that the oral ingestion of marijuana would be likely to injure the health of a child. Expert testimony generally is admissible if "(1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Borrelli*, 227 Conn. 153, 165, 629 A.2d 1105 (1993). Although expert testimony may be admissible in many instances, it is required only when "the question involved goes beyond the field of the ordinary knowledge and experience" of the trier of fact. *Franchey* v. *Hannes*, 155 Conn. 663, 666, 237 A.2d 364 (1967); see also C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.5.4, pp. 517–20. "The trier of fact need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters." *Way* v. *Pavent*, 179 Conn. 377, 380, 426 A.2d 780 (1979).

In *State* v. *Clark*, 260 Conn. 813, 801 A.2d 718 (2002), we addressed the question of whether the effects of marijuana are within the common knowledge of jurors. In that case, the defendant was convicted of possession of a pistol or revolver in violation of General Statutes § 53a-217c, in connection with a fatal shooting. Id., 814–15. A key eyewitness for the state admitted to smoking

five marijuana cigarettes prior to the shooting. Id., 817. The defendant presented no expert testimony and defense counsel did not cross-examine the eyewitness concerning the effect that the marijuana had on the eyewitness' ability to perceive and recall the events on the night of the shooting. Id., 817, 819. The trial court instructed the jury that because no evidence had been presented about the marijuana's effect on the eyewitness, they could "not speculate that he was or was not affected by it or how he was affected by it." Id., 819. The defendant challenged the instruction on appeal, arguing that the adverse effects of marijuana on a witness' perception and memory are within the common knowledge of jurors and that no testimony was required for the jury to consider these effects.[13] Id., 819, 822. We agreed.

In *Clark*, we stated that "because [marijuana] is an illegal substance, it may be that many jurors may have no firsthand knowledge regarding the effects of marijuana on one's ability to perceive and to relate events. At the same time, we cannot blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or friends. The ability to draw inferences about the impairing effects of marijuana, like alcohol, however, is based upon common knowledge, experience and common sense, not necessarily on personal experience. . . . The unfortunate prevalence of marijuana use, coupled with the substantial effort to educate all segments of the public regarding its dangers, underscores the reality that the likely effects of smoking

---

[13] The state did not contend that *expert* testimony on the effects of marijuana was necessary, but rather, that *some* testimony concerning its effect on the eyewitness was necessary before the jury could consider the evidence of drug use. *State* v. *Clark*, supra, 260 Conn. 821. This burden could have been satisfied, the state argued, by cross-examination of the eyewitness. Id.

five marijuana cigarettes in a short period of time before an incident are within the ken of the average juror."[14] (Citations omitted.) Id., 824–25. Accordingly, we concluded that the trial court had improperly instructed the jury that it could not consider the effect of marijuana use on the eyewitness. Id., 826.

The state argues that our holding in *Clark* is controlling in this case and, therefore, that expert testimony was not necessary to establish the injurious effects that the ingestion of marijuana likely would have on the health of a child. The defense urges us to interpret *Clark* narrowly and to hold that while the effects of

[14] We summarized the state of public knowledge of the effects of marijuana as follows. "Over the past several years, millions of dollars of state, federal and private funds have been expended on informing the public of the dangers and the impact of marijuana use. The following basic information exemplifies what is readily available on the internet and in various print media: 'Effects of smoking [marijuana] are generally felt within a few minutes and peak in [ten] to [thirty] minutes. They include dry mouth and throat, increased heart rate, impaired coordination and balance, delayed reaction time, and diminished short-term memory. Moderate doses tend to induce a sense of well-being and a dreamy state of relaxation that encourages fantasies, renders some users highly suggestible, and distorts perception (making it dangerous to operate machinery, drive a car or boat, or ride a bicycle). Stronger doses prompt more intense and often disturbing reactions including paranoia and hallucinations.' American Council for Drug Education, 'Basic Facts About Drugs: Marijuana,' (1999) at http://www.acde.org/youth/Research.htm; see also National Institute of Drug Abuse, 'Marijuana: Facts for Teens,' (November, 1998) at http://www.nida.nih.gov/MarijBroch/Marijteenstxt.html ('short-term effects of marijuana include: problems with memory and learning; distorted perception [sights, sounds, time, touch]; trouble with thinking and problem-solving; loss of coordination; and increased heart rate, anxiety'). Moreover, surveys of marijuana use show a significant percent of the public has used marijuana at least once by the time they are in twelfth grade. See, e.g., National Institute of Drug Abuse, 'Marijuana, Other Drug Use Among Teens Continues to Rise,' (March/April 1995) at http://www.nida.nih.gov/NIDA_Notes/NNVol10N2/Marijuanateens.html ('[i]n 1979, for example, 50.8 [percent] of [twelfth] graders had tried marijuana in the past year, and every year from 1975 through 1985, the percentage of [twelfth] graders who had smoked marijuana at least once in the year before the survey was more than 40 percent'; for 1994, the number was 30.7 percent of twelfth graders)." *State* v. *Clark*, supra, 260 Conn. 825 n.8.

*smoking* marijuana may be within the common knowledge of jurors, the effects of *eating* marijuana are not and, therefore, expert testimony was required in this case. We agree with the state that the reasoning of *Clark* governs the outcome in this matter and hold that the detrimental effects of marijuana, regardless of the method used to introduce the drug into the body, are within the common knowledge of the average juror.

Marijuana is a schedule I controlled substance. See General Statutes § 21a-243 (c);[15] Regs., Conn. State Agencies § 21a-243-7 (c) (20);[16] see also 21 U.S.C. § 812 (b) (1)[17] and (c) (c) (10).[18] General Statutes §§ 21a-277

[15] General Statutes § 21a-243 (c) provides: "The Commissioner of Consumer Protection acting upon the advice of the Commission of Pharmacy, may by regulation designate, after investigation, as a controlled substance, a substance or chemical composition containing any quantity of a substance which has been found to have a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and having a tendency to promote abuse or physiological or psychological dependence or both. Such substances are classifiable as amphetamine-type, barbiturate-type, cannabis-type, cocaine-type, hallucinogenic, morphine-type and other stimulant and depressant substances, and specifically exclude alcohol, caffeine and nicotine. Substances which are designated as controlled substances shall be classified in schedules I to V by regulations adopted pursuant to subsection (a) of this section."

[16] Section 21a-243-7 of the Regulations of Connecticut State Agencies provides in relevant part: "The controlled substances listed in this regulation are included by whatever official, common, usual, chemical, or trade name designation in Schedule I . . .

"(c) Any material, compound, mixture or preparation which contains their salts, isomers and salts of isomers, unless specifically excepted, whenever the existence of these salts, isomers, and salts of isomers is possible within the specific chemical designation . . .

"(20) Marihuana . . . ."

[17] Section 812 (b) (1) of title 21 of the United States Code provides in relevant part that a drug is classified as schedule I if: "(A) The drug or other substance has a high potential for abuse.

"(B) The drug or other substance has no currently accepted medical use in treatment in the United States.

"(C) There is a lack of accepted safety for use of the drug or other substances under medical supervision. . . ."

[18] Section 812 (c) (c) of title 21 of the United States Code categorizes marijuana as a schedule I controlled substance and provides in relevant

(b) and 21a-278 (b) make it illegal to manufacture, distribute, sell, prescribe, dispense, compound, transport with intent to sell or dispense, possess with intent to sell or dispense, offer, give or administer marijuana to another person. The penalty for violating these statutes is more severe when the defendant transacts with a minor less than eighteen years of age or when the defendant induces a minor to violate these statutes. See General Statutes §§ 21a-278a (a)[19] and 21a-278a (c).[20] Additionally, a violation of §§ 21a-277 (b), 21a-278 (b) or 21a-279 (c)[21] within 1500 feet of a public or private elementary or secondary school, licensed child day care center, or public housing project carries a more strin-

part: "Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation . . .

"(10) marihuana."

[19] General Statutes § 21a-278a (a) provides: "Any person eighteen years of age or older who violates section 21a-277 or 21a-278, and who is not, at the time of such action, a drug-dependent person, by distributing, selling, prescribing, dispensing, offering, giving or administering any controlled substance to another person who is under eighteen years of age and is at least two years younger than such person who is in violation of section 21a-277 or 21a-278, shall be imprisoned for a term of two years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278."

[20] General Statutes § 21a-278a (c) provides: "Any person who employs, hires, uses, persuades, induces, entices or coerces a person under eighteen years of age to violate section 21a-277 or 21a-278 shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278."

[21] General Statutes § 21a-279 (c) provides in relevant part: "Any person . . . who possesses or has under his control less than four ounces of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be fined not more than one thousand dollars or be imprisoned not more than one year, or be both fined and imprisoned; and for a subsequent offense, may be fined not more than three thousand dollars or be imprisoned not more than five years, or be both fined and imprisoned."

gent penalty. See General Statutes §§ 21a-278a (b) and 21a-279 (d).[22]

Thus, the Connecticut legislature has made the clear determination that marijuana is a dangerous substance[23] from which children, especially, should be pro-

---

[22] General Statutes § 21a-279 (d) provides in relevant part: "Any person who violates subsection (a), (b) or (c) of this section in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school and who is not enrolled as a student in such school or a licensed child day care center . . . shall be imprisoned for a term of two years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of subsection (a), (b) or (c) of this section."

[23] In her brief, Padua points out that "state legislatures have legalized marijuana for medicinal purposes, suggesting that it has beneficial properties." We recognize that some states have legalized the drug for medicinal purposes and that the possible benefits of marijuana are controversial. The undisputed fact remains, however, that under federal and Connecticut law, marijuana is a schedule I controlled substance and as such it "has no currently accepted medical use in treatment . . . [and] [t]here is a lack of accepted safety for use of the drug . . . under medical supervision." 21 U.S.C. § 812 (b) (1) (B) and (C); cf. *United States* v. *Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 493, 121 S. Ct. 1711, 149 L. Ed. 2d 722 (2001) (holding that "Congress has made a determination that marijuana has no medical benefits" to warrant medical necessity exception to federal prohibition against distributing, manufacturing, and possessing with intent to distribute or manufacture marijuana in violation of 21 U.S.C. § 841 [a]). Further, we acknowledge that General Statutes § 21a-253 permits the possession of marijuana pursuant to a prescription by a licensed physician "for the treatment of glaucoma or the side effects of chemotherapy." This statute was enacted, however, to permit the medicinal use of marijuana consistent with federal law. See 24 S. Proc., Pt. 16, 1981 Sess., pp. 5220–77. Because the federal government has not permitted such use, no prescriptions have ever been issued under this statute. See National Organization for Reform of Marijuana Laws, "State by State Medical Necessity Defense," at http://www.norml.org/index.cfm?Group_ID=5814. In any event, our holding would be the same if this were a case in which the defendants had large amounts of any commonly known potent medicinal substance, unsecured, within the reach of small children, and placed next to boxes of food in a communal dining area. Cf. *State* v. *Branham*, 56 Conn. App. 395, 743 A.2d 635 (defendant created situation injurious to health or life or limb of three children when he left them alone in apartment for one hour), cert. denied, 252 Conn. 937, 747 A.2d 3 (2000).

tected.[24] The public is presumed to be aware of that determination. See, e.g., *Hebb* v. *Zoning Board of Appeals*, 150 Conn. 539, 542, 192 A.2d 206 (1963) ("[i]t is a familiar legal maxim that everyone is presumed to know the law"). Moreover, although the most familiar method of consumption of the drug may be by smoking it, common knowledge, experience and common sense inform us that the effects of the drug can also be experienced if it is ingested orally.[25]

The defendants argue that information concerning the oral consumption of marijuana pertains to *cooked* marijuana and does not inform the average juror about the effects of eating *raw* marijuana. We do not find this distinction to be persuasive.[26] Although it is reasonable

[24] The dissent criticizes this court for its reliance on the illegality of marijuana in arriving at the determination that it is common knowledge that the oral ingestion of marijuana is likely to be injurious to a child's health. The legislature, however, does not randomly classify drugs into different schedules; see, e.g., *United States* v. *Kiffer*, 477 F.2d 349, 355–56 (2d Cir.), cert. denied, 414 U.S. 831, 94 S. Ct. 62, 38 L. Ed. 2d 65 (1973); but rather, classifies drugs on the basis of scientific research and testing. See 21 U.S.C. § 812 (b). Thus, we are is not relying on the *legal status* of marijuana, but rather, on the *scientific research and testing* that resulted in the classification of marijuana as a schedule I controlled substance.

[25] Here, as in *Clark*, we note that societal realities support our conclusion. Popular television shows and movies have depicted individuals experiencing the effects of marijuana after eating the drug baked into brownies. Additionally, information concerning the oral consumption of marijuana has appeared in the news and on websites. See, e.g., "Confiscated Brownies Sent to State Lab," Hartford Courant, November 1, 2002, p. B2 (twelve year old boy brought marijuana brownies to school); National Institute on Drug Abuse, "NIDA InfoFacts: Marijuana," at http://www.drugabuse.gov/Infofax/marijuana.html (noting that marijuana can be used by "mixing [it] in food or brewing it as a tea").

[26] The dissent argues that "[t]he ingestion of raw marijuana is not a practice engaged in by even a statistically significant minority of the population" and questions "whether, prior to this case, an average juror would have contemplated that anyone intentionally would ingest raw marijuana." Yet, our research has disclosed numerous cases in which individuals orally ingested raw marijuana either because they preferred to consume the drug in this manner; see, e.g., *People* v. *Galambos*, 104 Cal. App. 4th 1147, 1153, 128 Cal. Rptr. 2d 844 (2002) ("[s]ince 1991, defendant has been eating and smoking marijuana"); *Gudinas* v. *State*, 816 So.2d 1095, 1104 (Fla. 2002)

to infer that the potency and longevity of the drug in the body may differ depending upon the chosen method of delivery, it is still a widely known fact that marijuana is an illegal drug that will adversely affect the recipient, whether the drug is smoked, baked, sautéed, infused into alcohol, brewed in a tea, eaten raw, or consumed in any other inventive manner.[27]

(defendant in murder trial admitted to eating marijuana joints and expert testified that marijuana removes inhibitions); *Caffey* v. *State*, 433 S.W.2d 900, 901 (Tex. Crim. App. 1968) (defendant admitted that he "swallowed or 'ate' " some marijuana left at his home by another individual); *State* v. *Miller*, 131 Wash. 2d 78, 84, 929 P.2d 372 (1997) (defendant ate marijuana to get high because he thought it would be less detectable in his system); *State* v. *Shepherd*, 110 Wash. App. 544, 552, 41 P.3d 1235 (2002) (defendant ate, rather than smoked, marijuana to alleviate medical condition); or because they hope to avoid police detection. See, e.g., *Kehinde* v. *State*, 236 Ga. App. 400, 512 S.E.2d 311 (1999); *State* v. *Knippers*, 535 So.2d 403 (La. App. 1988); *Davis* v. *State*, 100 Md. App. 369, 374, 641 A.2d 941 (1994); *Holmes* v. *State*, 962 S.W.2d 663 (Tex. App. 1998).

The dissent also refers to the "overall lack of research" on the effects of eating raw marijuana in support of its conclusion. We concede that there is a dearth of scientific articles on the subject, but point out that the lack of research is largely due to marijuana's illegality. Of the scientific data available, we have found no indication that the ingestion of raw marijuana is *not* injurious. The administrative decision cited by the dissent merely indicates that eating raw marijuana is not *fatal*, not that it is not harmful. See *In the Matter of Marijuana Rescheduling Petition*, Docket No. 86-22, Drug Enforcement Administration (September 6, 1988). Moreover, it is well documented and is largely undisputed that household pets suffer adverse effects when they accidentally ingest raw marijuana. The common side effects of "marijuana toxicosis" in animals are "depression, ataxia, and bradycardia. Other signs include agitation, vocalization, vomiting, diarrhea, hypersalivation, tachycardia, hypothermia, mydriasis, urinary incontinence, seizures and coma." C. Donaldson, "Marijuana Exposure in Animals," Veterinary Medicine (2002) pp. 437, 439 (although marijuana toxicosis is serious clinical condition, it is generally not fatal); see also K. McKnight, "Marijuana Toxicosis," Veterinary Technician (2003) p. 266 (same). The harmful effects that animals experience after eating raw marijuana support our conclusion that the ingestion of marijuana, in any form, is likely to be injurious.

[27] The defendants argue that it is unlikely that the jury in this case was familiar with uncommon methods of drug use because the jurors had informed the court during voir dire that they did not know anyone personally whose life had been affected by drugs. We do not find this argument to be persuasive. First, the fact that the jurors lacked *personal* knowledge concerning drug use does not mean that they lacked *general* knowledge. See *State* v. *Clark*, supra, 260 Conn. 824. Second, in our evaluation of whether the effects of ingesting raw marijuana are common knowledge, we are

"Jurors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *Vajda* v. *Tusla*, 214 Conn. 523, 537, 572 A.2d 998 (1990). Accordingly, we conclude that it was reasonable for the jury to infer, on the basis of its own common knowledge and experience, that the ingestion of raw marijuana would likely be harmful to the health of a child. We recognize that the precise physiological effects of marijuana and their severity may not be within the common knowledge of the average juror and that expert testimony would be helpful in establishing these effects. The only question before the jury in this case, however, was whether the ingestion of marijuana would be likely to injure a child. The jury did not need to make a determination as to the precise nature or severity of the injury. Because, as we have discussed, the effects of orally ingesting marijuana are within the common knowledge of the average juror, expert testimony was not necessary to establish a violation of § 53-21 (1).

B

The state also claims that the Appellate Court improperly determined that there was insufficient evidence to

concerned with the knowledge of *average* jurors and not with the knowledge of these *particular* jurors. Accordingly, the defendants' emphasis on voir dire is misplaced.

Additionally, we reject the Appellate Court's argument that because marijuana derives from the hemp plant, which has some legal use in food products, it cannot be assumed that it is common knowledge that some parts of the hemp plant are harmless and legal while other parts are dangerous and illegal. *State* v. *Padua*, supra, 73 Conn. App. 397–98. First, as the Appellate Court acknowledged, information regarding hemp was not presented to the jury in this case. Id., 397. Second, we think that the Appellate Court and the defendants have underestimated the ability of the average juror to distinguish between the possible injurious effects of a well-known illicit substance and those of a commercial food product sold at the local grocery store.

convict the defendants of risk of injury to a child in violation of § 53-21 (1) because there was no direct evidence concerning the supervision of the children or whether the children were permitted access to the marijuana. We agree.

The following additional facts, which the jury reasonably could have found, are necessary for our resolution of this claim. In February of 1999, the police began investigating 171 Cameo Drive for suspected drug trafficking after a confidential informant reported that drug activity had been conducted from the apartment for quite some time. On March 12, 1999, the police searched the apartment, pursuant to a valid search warrant, for approximately three and one-half hours. During that time, sixteen people came to the door seeking to purchase marijuana and eleven arrests were made.

Additionally, the police seized bank receipts and records indicating that beginning in November of 1998, large cash deposits had been made into the bank accounts of Calvente family members, many of whom were unemployed or had no significant income. The police seized approximately $49,500 from Calvente family bank accounts. The jury heard testimony that it is common for drug dealers to use the bank accounts of family and friends for their cash deposits.

As we have noted, in reviewing an insufficiency of the evidence claim, we construe the evidence in the light most favorable to sustaining the verdict and determine whether the jury reasonably could have found that the evidence supported a finding of guilt beyond a reasonable doubt. See *State* v. *Garner*, supra, 270 Conn. 472. In this case, the jury reasonably could have concluded that the defendants had been conducting a lucrative drug trafficking operation out of 171 Cameo Drive for months prior to their arrest and that this operation was part of the daily life of the household. Additionally,

because of the large volume of drug traffic and the large quantities of unsecured marijuana throughout the apartment, the jury reasonably could have concluded that it would have been difficult to keep an adequate watch on two young children. The household conditions were such that the jury reasonably could have found that even heightened standards of supervision would not have been adequate to protect the children's health.

Jurors are expected to bring their common sense and common experience to the deliberation process. See *Vajda* v. *Tusla*, supra, 214 Conn. 537. Common sense and experience inform us that young children are inquisitive and impulsive. Therefore, it is reasonable to conclude that children might ingest harmful substances to which they have access on a daily basis, if such substances are not properly secured and conditions make it difficult to supervise the children adequately. Although both Padua and Miranda Calvente were present in the kitchen with the children when the police entered the apartment, the large volume of drug traffic through the apartment and the large quantity of unsecured marijuana located in close proximity to the household food and within the reach of young children, made it reasonable for the jury to infer that the children easily could have accessed the marijuana. Thus, in the present matter, the state was not required to present testimony that the children were inadequately supervised. Construing the evidence in the light most favorable to sustaining the jury's verdict, we conclude that the jury reasonably could have found beyond a reasonable doubt that the children had access to the marijuana and, therefore, that the defendants wilfully created a situation detrimental to the welfare of the children in violation of § 53-21 (1). Accordingly, we reverse the judgment of the Appellate Court with respect to the risk of injury charges.[28]

---

[28] We reject Wilfredo Calvente's alternative argument that we should uphold the Appellate Court's reversal of his conviction under § 53-21 (1) on

C

Miranda Calvente asserts as an alternate ground for affirmance that the evidence was insufficient to convict her under § 53-21 (1) because the state failed to present evidence that she wilfully created a situation likely to impair the health of the children or that she was in a position to protect the children from risk. Specifically, she argues that there was no evidence that she brought the marijuana into the apartment or that she had a duty

the grounds of instructional error. Specifically, he argues that the information charged him with allowing the children to "be near *and* have access to" marijuana, but that the trial court improperly instructed the jury that the state need only prove that he allowed the children "to be near *or* have access to" marijuana. (Emphasis added.) Therefore, Wilfredo Calvente argues, the jury could have found him guilty because it found that the children were *near* marijuana, even if it found that they did not have *access* to marijuana. We are not persuaded. Wilfredo Calvente concedes that he did not preserve this claim and seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In *Golding*, we held that a defendant can "prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. As we have explained in part I B of this opinion, the state presented sufficient evidence for the jury to find, beyond a reasonable doubt, that the children were near the marijuana *and* had access to the marijuana. Additionally, we note that the trial court read the risk of injury charges, with the conjunctive phrasing "near *and* access to" marijuana, prior to the presentation of evidence and that the jury had the final jury instructions and charging documents, with the correct phrasing, in the jury room with them during their deliberations. (Emphasis added.) We conclude that it is not reasonably possible that the jury was misled by the court's minor misstatement to believe that it could convict the defendants if they found that the children were near the marijuana, but did not have access to it. See *State* v. *McColl*, 74 Conn. App. 545, 552–53, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003) (not reasonably possible that jury was misled when trial court correctly charged jury in conjunctive on previous occasion and jurors had copy of information, with conjunctive phrasing, during deliberations). Accordingly, Wilfredo Calvente cannot satisfy the third and fourth prongs of *Golding*.

to care for the children while their parents were present. We disagree.

Under the situation portion of § 53-21 (1), wilful "means doing a forbidden act *purposefully* in violation of the law." (Emphasis in original.) *State* v. *Miranda*, 56 Conn. App. 298, 312–13, 742 A.2d 1276 (2000), rev'd on other grounds, 260 Conn. 93, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002). "It means that the defendant acted *intentionally* in the sense that [her] conduct was *voluntary* and not inadvertent . . . ." (Emphasis in original.) Id., 313. Therefore, "wilful misconduct is *intentional miscon- duct*, which is *conduct done purposefully and with knowledge of [its] likely consequences*." (Emphasis in original.) Id. (defendant acted wilfully when he failed to protect infant child from abuse by live-in girlfriend); *State* v. *Smalls*, 78 Conn. App. 535, 546–48, 827 A.2d 784 (defendant acted wilfully and with reckless disregard to child's mental health when he shot father in front of child, even if he did not know child was victim's daugh- ter), cert. denied, 266 Conn. 931, 837 A.2d 806 (2003).

We reiterate that when reviewing a claim of eviden- tiary insufficiency, we construe the evidence in the light most favorable to sustaining the verdict and determine whether, on the basis of the evidence, the jury reason- ably could have found the defendant guilty beyond a reasonable doubt. *State* v. *Garner*, supra, 270 Conn. 472. The jury found Miranda Calvente guilty of possession of marijuana with intent to sell in violation of §§ 53a-8 and 21a-277, possession of marijuana with intent to sell within 1500 feet of a public housing project in violation of §§ 53a-8, 21a-277 (b) and 21a-278a (b), conspiracy to sell marijuana in violation of §§ 53a-48 and 21a-277 (b), and conspiracy to sell marijuana within 1500 feet of a public housing project in violation of §§ 53a-48, 21a-277 (b) and 21a-278a (b). As discussed in the Appellate

Court opinion and in part III B of this opinion, the evidence was sufficient to support her conviction of these charges. See *State* v. *Padua*, supra, 73 Conn. App. 414–20. Although there was no direct evidence that she brought the marijuana into the apartment on the night of March 12, 1999, there was evidence that she was in possession or control of some of the marijuana[29] and that she was part of an ongoing criminal conspiracy to conduct a drug trafficking operation out of the apartment. Thus, the evidence established that Miranda Calvente intentionally participated in a drug trafficking enterprise in which large quantities of marijuana were left unsecured in the common areas of the apartment and within the reach of young children. Additionally, Miranda Calvente knew the likely consequences of her actions because, as discussed in part I A of this opinion, it is common knowledge that the oral ingestion of marijuana would likely be injurious to the health of children. Accordingly, construing the evidence in the light most favorable to sustaining the verdict, the evidence was sufficient for the jury reasonably to conclude that Miranda Calvente acted wilfully and in a manner likely to pose a risk of injury to the health of her grandchildren.

Miranda Calvente relies on our holding in *State* v. *Miranda*, 245 Conn. 209, 715 A.2d 680 (1998) (*Miranda*

[29] We recognize that, because Miranda Calvente was acquitted of possession of more than four ounces of marijuana in violation of §§ 53a-8 and 21a-279 (b), she was not found to be in possession or control of all of the marijuana found in the apartment. We note, however, that evidence was presented that less than four ounces of marijuana was present on the kitchen table and floor and that Miranda Calvente and the children were located in the kitchen when the police entered the apartment. Accordingly, it was reasonable for the jury to conclude that Miranda Calvente was in possession or control of the marijuana in the kitchen. Because the children were near the marijuana in the kitchen and had access to it; see discussion in part I B of this opinion; the jury's judgment of acquittal on the charge of possession of more than four ounces of marijuana is consistent with her convictions of risk of injury to a child.

*I*), appeal after remand, 260 Conn. 93, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002), in support of her claim that a legal duty to protect the children from harm must exist for her convictions under § 53-21 (1) to stand.[30] Her reliance on *Miranda I* is misplaced. In that case, we upheld the defendant's conviction of first degree assault under General Statutes § 53a-59 (a) (3) for his *failure* to protect his live-in girlfriend's child from physical abuse at the hands of her mother because, although he was not the child's biological father, he had assumed a paternal role within the family and thus had a legal duty to protect the child. Id., 226–30. The defendant's conviction in *Miranda I* was predicated on his failure to act when he had a legal duty to do so. In the present matter, however, the jury found that Miranda Calvente actively assisted in the creation of a situation dangerous to the children's health. Therefore, Miranda Calvente's conviction is based on her affirmative acts, rather than on the failure to act where a legal duty exists, as in *Miranda I*.[31]

General Statutes (Rev. to 1999) § 53-21 provides in relevant part that *"[a]ny person* who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that . . . the health of such child is likely to be injured . . . shall be guilty of a class C felony." (Emphasis added.) The clear language of § 53-21 (1) and the case law inter-

---

[30] In *State* v. *Miranda*, 272 Conn. 430, 864 A.2d 1 (2004), we reversed our decision in *Miranda I*, for reasons to be explained in a forthcoming opinion. As we explain in the body of this opinion, however, *Miranda I* simply has no bearing on the present matter and, accordingly, our reasons for overruling the case are immaterial.

[31] In addition, in *Miranda I*, the defendant did not challenge his conviction under § 53-21, but acknowledged that "the risk of injury statute implements the state's public policy of protecting the health and welfare of children and imposes a specific criminal penalty for failure to provide such protection, by punishing *any person* who causes or permits a child to be placed in such a situation that the life or limb of that child is endangered." (Emphasis in original; internal quotation marks omitted.) *Miranda I*, supra, 245 Conn. 229.

preting it contain no requirement that the defendant be a parent or guardian of the child or owe a duty of care to the child in order to be convicted under the statute. See, e.g., *State* v. *March*, 39 Conn. App. 267, 269, 275–76, 664 A.2d 1157 (defendant convicted under § 53-21 for, inter alia, providing four year old child with rum while her mother was present), cert. denied, 235 Conn. 930, 667 A.2d 801 (1995); *In re John C.*, 20 Conn. App. 694, 696–97, 569 A.2d 1154 (1990) (" '[a]ny person' " in § 53-21 includes minors). Because the evidence was sufficient for the jury to find, beyond a reasonable doubt, that Miranda Calvente wilfully created a situation posing risk of harm to the health of the children, we reject her alternate ground for affirmance and reverse the judgment of the Appellate Court with respect to her conviction under § 53-21 (1).

## II

The state's second claim on appeal requires us to determine whether the Appellate Court improperly reversed the defendants' convictions for conspiracy to sell marijuana within 1500 feet of a public housing project because of instructional error. Wilfredo Calvente argues that if we reverse the Appellate Court's judgment and remand the matter with direction to reinstate the defendants' convictions, imposing a sentence both for conspiracy to sell marijuana and for conspiracy to sell marijuana within 1500 feet of a public housing project would violate the double jeopardy clause of the United States constitution. We conclude that the Appellate Court properly found that the trial court's jury instructions were improper, but hold that the impropriety was harmless. Additionally, we agree that imposing a sentence for both conspiracy counts would violate the double jeopardy clause.

## A

The state argues that the Appellate Court improperly reversed the defendants' convictions for conspiracy to

sell marijuana within 1500 feet of a public housing project because of instructional error. See *State* v. *Padua*, supra, 73 Conn. App. 402–405. The trial court instructed the jury as follows: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage [in] or cause the performance of such conduct and any one of them commits an overt act in pursuance of such conspiracy. The elements of the crime are identical [to] those in count four with the added element that the state must prove beyond a reasonable doubt that the *conspiracy occurred within 1500 feet of a public housing project.*" (Emphasis added; internal quotation marks omitted.) The Appellate Court found, and the defendants argue, that the trial court's instruction was improper because it omitted the essential element that the *object* of the conspiracy must be to sell marijuana within 1500 feet of a public housing project and, instead, improperly instructed the jury that the *conspiracy* or agreement to sell marijuana must occur within 1500 feet of a public housing project.[32] *State* v. *Padua*, supra, 402–404. The state concedes that the instruction was improper, but argues that because there was overwhelming and incontrovertible evidence that the mari-

[32] The defendants failed to preserve their objection to the instruction and prevailed in the Appellate Court under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). *State* v. *Padua*, supra, 73 Conn. App. 399, 404. Although Miranda Calvente was the only defendant who raised this claim on appeal to the Appellate Court; id.; the court reversed the convictions of all three defendants, after finding the instruction improper and concluding that it was reasonably possible that the jury was misled. Id., 404 and n.4, citing *Gino's Pizza of East Hartford, Inc.* v. *Kaplan*, 193 Conn. 135, 141–42, 475 A.2d 305 (1984). In response to the state's appeal to this court, all three defendants seek to prevail under *Golding*. We agree with the Appellate Court that the claim is reviewable under *Golding* because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Padua*, supra, 399; see also *State* v. *Whitford*, 260 Conn. 610, 621, 799 A.2d 1034 (2002) ("[t]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail").

juana sales occurred at 171 Cameo Drive, which was located in a public housing project, and because the jury found the defendants guilty of conspiracy to sell marijuana and possession of marijuana with intent to sell within 1500 feet of a public housing project, the jury necessarily must have found that the defendants conspired to sell marijuana within 1500 feet of a public housing project. Therefore, the state contends, the improper instruction was harmless beyond a reasonable doubt. We agree.

"It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are." (Citations omitted; internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 483–84, 668 A.2d 682 (1995).

If an improper jury instruction is of constitutional magnitude, "the burden is on the state to prove harmlessness beyond a reasonable doubt." *State* v. *Spillane*, 255 Conn. 746, 757, 770 A.2d 898 (2001). "An alleged defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled. . . . In performing harmless error analysis, we keep in mind that [i]n determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in

guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge." (Citations omitted; internal quotation marks omitted.) Id.

When a jury is misinstructed on an essential element of a crime and "a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Rose* v. *Clark*, 478 U.S. 570, 579, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986). Further, "a jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court concludes beyond a reasonable doubt that the omitted element was *uncontested and supported by overwhelming evidence*, such that the jury verdict would have been the same absent the error . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 737–38, 759 A.2d 995 (2000), quoting *Neder* v. *United States*, 527 U.S. 1, 17, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

"Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy." (Internal quotation marks omitted.) *State* v. *Beccia*, 199 Conn. 1, 3–4, 505 A.2d 683 (1986). Thus, "[p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Internal quotation marks omitted.) Id., 5. In the present matter, the charged object of the conspiracy was to sell marijuana within 1500 feet of a public housing project. The essential elements of the crime of conspiracy to sell marijuana within 1500 feet of a public housing project are (1) intent to agree or conspire, (2) intent to sell marijuana within 1500 feet

of a public housing project, and (3) an overt act commit-
ted in pursuance of this conspiracy. See General Stat-
utes §§ 53a-48, 21a-277 (b) and 21a-278a (b). Thus, it
was the state's burden to establish that the defendants
conspired or agreed to sell marijuana at a specific loca-
tion within 1500 feet of a public housing project and
that an overt act was committed in pursuance of the
conspiracy. Cf. *State* v. *Denby*, supra, 235 Conn. 483.
We conclude that the trial court's instruction, that the
"state must prove beyond a reasonable doubt that the
*conspiracy* occurred within 1500 feet of a public hous-
ing project"; (emphasis added); misstates the state's
burden of proof concerning the object of the conspiracy
and was, therefore, improper. We also conclude, how-
ever, that the instructional impropriety was harmless.

In the present case, the jury necessarily found that
the defendants intended to agree or to conspire to sell
marijuana because it found them guilty of conspiracy
to sell marijuana in violation of §§ 53a-48 and 21a-277
(b). The jury also necessarily found that the defendants
actually sold marijuana within 1500 feet of a public
housing project or that they intended to sell marijuana
within 1500 feet of a public housing project because it
found them guilty of possession of marijuana with intent
to sell within 1500 feet of a public housing project in
violation of §§ 53a-8, 21a-277 (b) and 21a-278a (b).[33]

---

[33] General Statutes § 21a-278a (b) provides in relevant part: "To constitute a
violation of this subsection, an act of transporting or possessing a controlled
substance shall be with intent to sell or dispense in or on, or within one
thousand five hundred feet of . . . a public housing project . . . ." In *State*
v. *Denby*, supra, 235 Conn. 480–83, we held that § 21a-278a (b) requires the
state to prove that the defendant intended to sell a controlled substance
within the geographic location specified by the statute, i.e., within 1500 feet
of a public housing project. Id. (intent to sell narcotics within 1000 feet of
school is essential element of crime of possession of narcotics with intent
to sell within 1000 feet of school in violation of § 21a-278a [b]). In this
matter, the trial court complied with the intent requirement by instructing
the jury as follows. "The elements of [possession of marijuana with intent
to sell within 1500 feet of a public housing project] are the same as in count
one with the added requirement that the sale or intent to sell marijuana

Additionally, in order to find the defendants guilty of conspiracy to sell marijuana, the jury must have found, beyond a reasonable doubt, the occurrence of at least one of the following charged overt acts, all of which took place within a public housing project:[34] "(1) [t]hat one or more of said parties did conduct sales of marijuana from the residence of Wilfredo Calvente at 171 Cameo Drive, Willimantic, CT; (2) [t]hat one or more of said parties did possess a large quantity of marijuana, to wit approximately 13 ounces of marijuana within said residence; (3) [t]hat one or more of said parties did separate and package said marijuana for purposes of resale within said residence." As the Appellate Court held and as we recognize in part III B of this opinion, the evidence was sufficient to convict the defendants of all of these charges. See *State* v. *Padua,* supra, 73 Conn. App. 406–12, 414–23.

The defendants argue that even if the jury necessarily made these findings, it reasonably could have found that the defendants conspired to sell marijuana, but that they did not form the intent to sell the marijuana within 1500 feet of a public housing project until later.

occurred in a public housing project. For you to find any defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: (1) that the defendant knowingly possessed with intent to sell or dispense to another person; (2) a controlled substance; (3) that the event occurred in a public housing project. . . . So if you find . . . the defendants guilty in count one, and you further find that the state has proven beyond a reasonable doubt that the sale or intent to sell occurred in a public housing project, then you must find the defendant or defendants also violated this statute." In *Denby,* we held that a similar jury instruction properly informed the jury of the geographic location element of § 21a-278a (b). See *State* v. *Denby,* supra, 485–87.

[34] The defendants claimed, for the first time on appeal to the Appellate Court, that the evidence was insufficient to establish that 171 Cameo Drive was located within a public housing project. See *State* v. *Padua,* supra, 73 Conn. App. 406–407. The Appellate Court found that the evidence presented at trial was sufficient to establish that the apartment was located within a public housing project and affirmed the defendants' convictions. See id., 406–12. That ruling is not at issue in this appeal.

Thus, the defendants contend, the jury did not necessarily conclude that they conspired to sell marijuana within 1500 feet of a public housing project because it is possible that the actual location for selling the marijuana could have differed from the initial location on which they agreed. We reject this argument. The incontrovertible and overwhelming evidence produced at trial established that 171 Cameo Drive was located in a public housing project, that large quantities of marijuana were packaged for sale inside the apartment and that sales of marijuana were conducted from the apartment. There was no evidence that the defendants had contemplated selling the marijuana anywhere other than at 171 Cameo Drive. We are satisfied "beyond a reasonable doubt that the omitted element was *uncontested and supported by overwhelming evidence*, such that the jury verdict would have been the same absent the error." (Emphasis in original; internal quotation marks omitted.) *State* v. *Montgomery*, supra, 254 Conn. 738.

This conclusion also disposes of the claims of Miranda Calvente and Padua, with respect to their convictions, that the instructional impropriety could not have been harmless beyond a reasonable doubt because there was no direct evidence of their active involvement in a conspiracy to sell marijuana from the apartment and because they produced witnesses and evidence to rebut the state's charges. These defendants did not dispute, however, the incontrovertible and overwhelming evidence that 171 Cameo Drive was located within a public housing project, that large quantities of marijuana were being packaged for sale inside the apartment, or that sales of marijuana were conducted from the apartment. Instead, they sought to convince the jury that the evidence was insufficient to establish beyond a reasonable doubt that they were *active participants* in the drug trafficking enterprise. As we have noted, the jury reasonably found Miranda Calvente and Padua

guilty of, inter alia, possession of marijuana with intent to sell, possession of marijuana with intent to sell within 1500 feet of a public housing project, and conspiracy to sell marijuana.[35] As we also have noted, there was no evidence that any of the defendants intended to or did sell marijuana from any location except 171 Cameo Drive. Therefore, a rational juror could only have found that the defendants were part of a conspiracy to sell marijuana within 1500 feet of a public housing project. See *State* v. *Spillane*, supra, 255 Conn. 758–59; *State* v. *Montgomery*, supra, 254 Conn. 738. Accordingly, we conclude that the improper jury instruction was harmless beyond a reasonable doubt and reverse the judgment of the Appellate Court.[36]

## B

We next address the argument[37] that if we reinstate the defendants' convictions for conspiracy to sell marijuana within 1500 feet of a public housing project, we should affirm the Appellate Court's judgment[38] that each defendant's two conspiracy convictions should be combined and their respective sentences for conspiracy to

[35] Miranda Calvente claims that there was insufficient evidence to support her conspiracy convictions because the state failed to produce sufficient evidence that she agreed or conspired with any of the other defendants to sell marijuana. We reject this claim in part III B of this opinion.

[36] In light of our holding, we do not reach the state's alternative argument that the trial court's instruction was harmless beyond a reasonable doubt because it added an additional element to their burden of proof.

[37] We recognize that the double jeopardy claim is outside the scope of the certified question, but we review the claim in the interest of judicial efficiency. *State* v. *Brown*, 242 Conn. 445, 447, 700 A.2d 1089 (1997) (court may address related claims not certified for review in interest of judicial economy).

[38] Although the Appellate Court reversed the defendants' convictions of conspiracy to sell marijuana within 1500 feet of a public housing project because of instructional error, it addressed the defendants' double jeopardy claims because the double jeopardy issue "[was] likely to arise in the new trial in the event that the jury again convicts the defendants of that crime." *State* v. *Padua*, supra, 73 Conn. App. 404.

sell marijuana should be vacated because the imposition of separate sentences for both convictions would violate the defendants' right to be free from multiple punishments for the same offense under the double jeopardy clause of the fifth amendment to the United States constitution.[39] See *State* v. *Padua*, supra, 73 Conn. App. 404–406. We agree.

The state did not brief or argue the issue before this court, but conceded on appeal to the Appellate Court "that each defendant's conviction of two counts of conspiracy resulting in two sentences arose out of the same agreement and violated their respective rights under the double jeopardy clause." Id., 405. We conclude that the Appellate Court properly determined that the appropriate remedy for the constitutional violation, under *State* v. *Howard*, 221 Conn. 447, 604 A.2d 1294 (1992), and *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), was to "combine the conspiracy convictions, to vacate the sentence for the lesser offense of conspiracy to sell a controlled substance in violation of §§ 53a-48 and 21a-277 (b), and to sentence the defendants only for conspiring to commit the offense within 1500 feet of a public housing project."[40] *State* v. *Padua*, supra, 73 Conn. App. 406.

The defendants were charged with two conspiracies both arising on the same date and at the same place. Essentially, the state charged the defendants with entering into a single unlawful agreement to commit two

---

[39] The double jeopardy clause of the fifth amendment to the United States constitution provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

[40] Although the state did not brief or argue the issue to this court, we point out that the state requested this remedy from the Appellate Court. *State* v. *Padua*, supra, 73 Conn. App. 405.

criminal purposes. "Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. . . . The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute . . . . For such a violation, only the single penalty prescribed by the statute can be imposed." (Internal quotation marks omitted.) *State* v. *Howard*, supra, 221 Conn. 462, quoting *Braverman* v. *United States*, 317 U.S. 49, 53–54, 63 S. Ct. 99, 87 L. Ed. 23 (1942). Accordingly, the defendants' multiple sentences for two separate conspiracies arising out of a single unlawful agreement cannot stand. See *State* v. *Vasquez*, 66 Conn. App. 118, 126–27, 783 A.2d 1183 (conviction and sentence for conspiracy to sell narcotics and conspiracy to sell narcotics within 1500 feet of school violate double jeopardy clause), cert. denied, 258 Conn. 941, 786 A.2d 428 (2001).

In *State* v. *Howard*, supra, 221 Conn. 462–63, we decided that the proper remedy for a double jeopardy violation arising out of two separate convictions and sentences for one unlawful conspiracy is to combine the two conspiracy convictions and vacate the sentence for one of them. It is appropriate to merge the two conspiracy convictions because "if the remaining conspiracy conviction were later invalidated upon collateral attack for a reason not affecting the merged conspiracy conviction, that unaffected conviction would be resuscitated and the defendant punished for it." Id., 463.

"[W]hen deciding which of two sentences to vacate when both cannot stand, the determinative factor is the intention of the sentencing judge." *State* v. *Chicano*, supra, 216 Conn. 713, citing *Green* v. *United States*, 365

U.S. 301, 306, 81 S. Ct. 653, 5 L. Ed. 2d 670 (1961). In the present matter, Miranda Calvente and Padua were both sentenced to two years imprisonment, execution suspended, and three years probation for the charge of conspiracy to sell marijuana and to three years imprisonment for the charge of conspiracy to sell marijuana within 1500 feet of a public housing project.[41] Wilfredo Calvente was sentenced to one year imprisonment, to run concurrently with the remainder of his sentence, for the charge of conspiracy to sell marijuana, and to three years imprisonment, to run consecutively with the remainder of his sentence, with four years special parole, for the charge of conspiracy to sell marijuana within 1500 feet of a public housing project. We conclude that the sentences and the manner in which they were imposed clearly indicate that the sentencing judge intended for the sentences for the convictions of conspiracy to sell marijuana within 1500 feet of a public housing project to control. See *State* v. *Chicano*, supra, 714. Accordingly, we conclude that the Appellate Court properly determined that the cases should be remanded to the trial court with direction to combine the conspiracy convictions, to vacate the sentences for conspiracy to sell marijuana in violation of §§ 53a-48 and 21a-277 (b) and to sentence the defendants only for conspiring

---

[41] The trial court sentenced Miranda Calvente and Padua to the mandatory minimum sentence of three years imprisonment for the charge of possession of marijuana with intent to sell within 1500 feet of a public housing project and three years imprisonment for conspiracy to commit the same offense. Although § 21a-278a (b) provides that the three year mandatory minimum incarceration period for possession of marijuana with intent to sell within 1500 feet of a public housing project may "not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278," the trial court ordered that the defendants' sentences for possession of marijuana with intent to sell within 1500 feet of a public housing project and conspiracy to sell marijuana within 1500 feet of a public housing project run concurrently to each other, but consecutive to all other sentences. The court concluded that the legislature would not intend the sentences to run consecutively under the factual circumstances presented in this case.

to sell marijuana within 1500 feet of a public housing project in violation of §§ 53a-48, 21a-277 (b) and 21a-278a (b).

## III

We next address Miranda Calvente's claims on appeal. First, she argues that the Appellate Court improperly declined to review her claim that the evidence was insufficient to convict her of conspiracy to sell marijuana within 1500 feet of a public housing project after reversing her conviction on that charge for instructional error. Second, she asks this court to review the merits of her insufficiency claim and to hold that the evidence was insufficient to support her conviction of conspiracy to sell marijuana within 1500 feet of a public housing project. We conclude that it was improper for the Appellate Court to decline to review Miranda Calvente's insufficiency claim, but further conclude that the evidence was sufficient for the jury to convict her beyond a reasonable doubt.

The following procedural history is relevant to our resolution of this claim. On appeal to the Appellate Court, Miranda Calvente alleged, inter alia, that (1) the evidence was insufficient to support her conviction for conspiracy to sell marijuana, (2) the trial court improperly instructed the jury on the essential elements of conspiracy to sell marijuana, (3) the evidence was insufficient to support her conviction for conspiracy to sell marijuana within 1500 feet of a public housing project and (4) the trial court improperly instructed the jury on the essential elements of conspiracy to sell marijuana within 1500 feet of a public housing project. See *State* v. *Padua*, supra, 73 Conn. App. 399–404, 415 n.9. The Appellate Court reviewed Miranda Calvente's unpreserved claims of instructional error under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[42] The court

[42] See footnote 28 of this opinion for a discussion of *Golding*.

concluded that the trial court's instructions on the charge of conspiracy to sell marijuana were proper and affirmed her conviction on that charge. See *State* v. *Padua*, supra, 399–402. The court determined, however, that it was reasonably possible that the jury was misled by the trial court's instructions on the charge of conspiracy to sell marijuana within 1500 feet of a public housing project and, accordingly, reversed Miranda Calvente's conviction on that charge. See id., 403–404; see also part II A of this opinion.

The Appellate Court did not review or expressly decline to review Miranda Calvente's claim on appeal that the evidence was insufficient to support her conviction of conspiracy to sell marijuana. It did, however, decline to review her claim that the evidence was insufficient to support her conviction of conspiracy to sell marijuana within 1500 feet of a public housing project because it had already reversed her conviction of that charge for instructional error. *State* v. *Padua*, supra, 73 Conn. App. 415 n.9.[43]

_____

[43] Specifically, the Appellate Court stated: "Miranda Calvente also claims that the state presented insufficient evidence that she conspired to sell a controlled substance within 1500 feet of a public housing project. Because we reverse the defendants' convictions on that count, we do not address that claim." *State* v. *Padua*, supra, 73 Conn. App. 415 n.9. We granted Miranda Calvente's petition for certification to appeal the judgment of the Appellate Court limited to the following issue: "Did the Appellate Court properly decline to review the claim of the defendant Miranda Virgilia Calvente, that there was insufficient evidence to convict her of conspiracy to sell marijuana within 1500 feet of a public housing project and conspiracy to sell marijuana, on the ground that it had reversed her convictions of those offenses for instructional error?" *State* v. *Padua*, 262 Conn. 941, 815 A.2d 672 (2003). We note that the certified question incorrectly states that both of Miranda Calvente's convictions were reversed for instructional error. See id.; *State* v. *Padua*, supra, 73 Conn. App. 404. Although the Appellate Court reversed *only* the conviction of conspiracy to sell marijuana within 1500 feet of a public housing project (count five); see *State* v. *Padua*, supra, 73 Conn. App. 404; Miranda Calvente argues that we should construe the grant of certification to encompass the conviction of conspiracy to sell marijuana (count four) because the Appellate Court, without providing a reason, improperly failed to review her insufficiency of the evidence claim on that charge. The state responds that the Appellate Court declined to review only

## A

The first part of Miranda Calvente's claim on appeal requires us to determine whether an Appellate Court must review a criminal defendant's insufficiency of the evidence claim prior to remanding a matter for a retrial because of trial error. She argues that the Appellate Court's failure to review her claim that the evidence was insufficient to support her conviction of conspiracy to sell marijuana within 1500 feet of a public housing project, because the court had already reversed her conviction on the grounds of instructional error, violated the double jeopardy clause of the United States constitution.[44] Miranda Calvente points out that, had

count five because of the reversal for instructional error and, therefore, the certified question only refers to count five. We agree with the state.

The state concedes, however, that "[a]s a practical matter, a review of the sufficiency of the evidence for [c]ount [five], conspiracy to sell marijuana within 1500 feet of a public housing project, necessarily encompasses a review of [c]ount [four], conspiracy to sell marijuana." Accordingly, "in fairness to [Miranda Calvente]," the state asks that "if this [c]ourt undertakes a review of the sufficiency of the evidence with regard to count [five] . . . this [c]ourt should also review the sufficiency of the evidence with regard to count [four]." We agree with the state and address Miranda Calvente's insufficiency of the evidence claim concerning conspiracy to sell marijuana in part III B of this opinion. See, e.g., *State* v. *Brown*, 242 Conn. 445, 447, 700 A.2d 1089 (1997) (court may address related claims not certified for review in interest of judicial economy).

[44] Miranda Calvente argues that her motion for judgment of acquittal at the end of the state's case-in-chief preserved this issue for appeal. We disagree because the record is unclear as to whether her motion was based upon insufficiency of the evidence. Alternatively, Miranda Calvente seeks to prevail on her claim under *State* v. *Golding*, supra, 213 Conn. 239–40. This court has held that a criminal defendant's insufficiency of the evidence claim is necessarily of constitutional magnitude. "We believe that *Jackson* v. *Virginia*, [443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)], compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. There being no practical significance, therefore, for engaging in a *Golding* analysis of an insufficiency of the evidence claim, we will review the defendant's challenge to his conviction . . . as we do any properly preserved claim." *State* v. *Adams*, 225 Conn. 270, 275–76 n.3, 623 A.2d 42 (1993). Accordingly, Miranda Calvente is entitled to *Golding* review.

the Appellate Court reviewed her claim and found the evidence to be insufficient, resulting in a judgment of acquittal, a retrial would have been barred by the double jeopardy clause. Therefore, she contends, the prohibition against double jeopardy required the Appellate Court to review her insufficiency of the evidence claim. The state agrees with Miranda Calvente.

We need not address Miranda Calvente's double jeopardy argument because we hold, pursuant to our general supervisory authority over appellate procedure, that a reviewing court must address a defendant's insufficiency of the evidence claim. "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [E]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions." (Citations omitted; internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 61 n.26, 826 A.2d 1126 (2003).

Interests of judicial efficiency, sound appellate policy and fundamental fairness require a reviewing court to address a defendant's insufficiency of the evidence claim prior to remanding a matter for retrial because of trial error. Pursuant to *Burks* v. *United States*, 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978), a defendant is entitled to a judgment of acquittal and retrial is barred if an appellate court determines that the evidence is insufficient to support the conviction. As the Seventh Circuit Court of Appeals observed, "[a]ll retrials involve duplicative efforts by judges, juries, prosecu-

tors and defendants, at considerable expense in time and money to all, and in anxiety to the defendant. If in fact insufficient evidence is presented at a first trial, a retrial, on any basis, ordinarily may be expected to be a wasted endeavor." *United States* v. *Douglas*, 874 F.2d 1145, 1150 (7th Cir.), cert. denied, 493 U.S. 841, 110 S. Ct. 126, 107 L. Ed. 2d 87 (1989); see also *United States* v. *Wallach*, 979 F.2d 912, 918 (2d Cir. 1992) ("we prefer not to subject the defendant to retrial without express consideration of the sufficiency challenges that he asserts were not disposed of on the prior appeal"), cert. denied, 508 U.S. 939, 113 S. Ct. 2414, 124 L. Ed. 2d 637 (1993). For these reasons, we conclude, on the basis of our supervisory authority over appellate procedure and the administration of justice, that a reviewing court must address a defendant's insufficiency of the evidence claim, if the claim is properly briefed and the record is adequate for the court's review, because resolution of the claim may be dispositive of the case and a retrial may be a "wasted endeavor." *United States* v. *Douglas*, supra, 1150. Accordingly, we conclude that the Appellate Court improperly declined to review Miranda Calvente's insufficiency of the evidence claim.

B

Thus, we must determine whether the evidence presented at trial was sufficient to support Miranda Calvente's conviction for conspiracy to sell marijuana within 1500 feet of a public housing project in violation of §§ 53a-48, 21a-277 (b) and 21a-278a (b).[45] Miranda Calvente contends that the state presented insufficient evidence for the jury to find, beyond a reasonable doubt,

---

[45] We recognize that an examination of the sufficiency of the evidence is outside the scope of the certified question, but we undertake a review of the evidence at the request of both parties and in the interest of judicial efficiency. See, e.g., *State* v. *Brown*, 242 Conn. 445, 447, 700 A.2d 1089 (1997) (court may address related claims not certified for review in interest of judicial economy).

that she knowingly agreed or conspired to sell marijuana within 1500 feet of a public housing project. We disagree.

The following additional facts, which the jury reasonably could have found, are necessary for our resolution of this claim. On the evening of March 12, 1999, after their second successful controlled buy of marijuana that afternoon, the police searched Miranda Calvente's purse during the execution of a search warrant for 171 Cameo Drive. The purse was located on a chair at the kitchen table. The inside of the purse was divided into two sections. On one side the police found $2500 in $10 and $20 bills folded over and wrapped in a blue hair band, while on the other side they found $282 in $10, $5 and $1 bills folded over in a similar manner. Inside the bundle of $2500, the police found a marked $10 bill that had been used earlier that day during a controlled drug purchase from the apartment. Willimantic police officers testified that the manner in which the bills were folded and separated was typical of narcotics traffickers. On March 13, 1999, Wilfredo Calvente made a written statement to the police that he was "the only one who buys, sells . . . and smokes the marijuana that the police found."

The trial court also admitted the following information concerning Miranda Calvente's husband for the limited purpose of establishing a conspiracy. On the night of Miranda Calvente's arrest, her husband, Jose Calvente, Sr., came to the police station claiming that the money found in her purse belonged to him, that he had earned it working overtime and that he had given it to his wife to deposit in her bank account. Although he was unsure of the amount of money he had given her, he knew it was a large amount. The next day, when he made a written statement to the police, he knew the exact amount of money found in Miranda Calvente's purse.

The state also presented evidence and testimony concerning Miranda Calvente's income and bank account. Between January and October, 1998, she received $559 per month by check from a state child care assistance program for babysitting her grandchildren. Additionally, Wilfredo Calvente told the police that he tried to pay Miranda Calvente "a little bit, $40 or $50 a week" for babysitting his children. The state also introduced a notarized statement, signed by Miranda Calvente, dated March 12, 1999, and addressed to the Norwich housing authority, stating that Miranda Calvente had no income or benefits. On March 23, 1999, the police seized Miranda Calvente's bank account containing $6806.08. The records of the account revealed that a net amount of $2200 in cash and checks had been deposited in the account between January, 1998, and January, 1999. Additionally, beginning in November of 1998, large cash deposits were made in the bank accounts of Calvente family members, many of whom were unemployed or had no significant income. Testimony was presented that it is common for drug dealers to use the bank accounts of family and friends for their cash deposits.

The standard for reviewing a claim of evidentiary insufficiency, as set forth in part I of this opinion, requires us to construe the evidence in the light most favorable to sustaining the verdict and to determine whether the jury reasonably could have found the defendant guilty beyond a reasonable doubt. *State* v. *Garner*, supra, 270 Conn. 472. "To establish the crime of conspiracy under § 53a-48 of the General Statutes, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. The existence of a formal agreement

between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." (Internal quotation marks omitted.) *State* v. *Ortiz*, 169 Conn. 642, 645, 363 A.2d 1091 (1975).

"Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . Indeed, a conspiracy can be inferred from the conduct of the accused . . . and his coconspirator, as well as from the circumstances presented as evidence in the case." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 227, 733 A.2d 156 (1999).

To meet its burden of proof, the state must produce sufficient evidence for the jury to find beyond a reasonable doubt that Miranda Calvente (1) intentionally agreed or conspired, (2) to sell marijuana at a geographic location within 1500 feet of a public housing project and (3) that an overt act was committed in pursuance of this conspiracy. See General Statutes §§ 53a-48, 21a-277 (b) and 21a-278a (b); see also *State* v. *Denby*, supra, 235 Conn. 483. Miranda Calvente contends that the state produced insufficient evidence of an agreement.[46] Essentially, she argues that none of the evidence produced at trial established that she " 'knowingly engaged in a mutual plan to do a forbidden act' with other individuals." We disagree.

---

[46] To the extent that Miranda Calvente challenges the sufficiency of the evidence to establish that she intended to commit the charged underlying offense, we adopt the reasoning of the Appellate Court and conclude that the evidence was sufficient to establish her possession of marijuana with intent to sell within 1500 feet of public housing project. See *State* v. *Padua*, supra, 73 Conn. App. 419–20.

On the basis of the evidence presented at trial, the jury could have reasonably found the following facts. At the time of her arrest, Miranda Calvente was in the kitchen of 171 Cameo Drive, which is located in a public housing project, with Wilfredo Calvente and Padua, where a large quantity of marijuana was being packaged for resale. Although she was unemployed, she had $2782 in her purse, folded and separated in a manner consistent with drug trafficking and containing a marked $10 bill that had been used earlier that day in a controlled drug purchase from the apartment. Additionally, the deposits made in Miranda Calvente's account and family member accounts were consistent with drug trafficking. We conclude that, viewing the evidence in the light most favorable to sustaining the jury's verdict, it was reasonable for the jury to conclude that Miranda Calvente intentionally agreed or conspired to sell marijuana within 1500 feet of a public housing project.

Miranda Calvente relies on *State* v. *Goodrum*, 39 Conn. App. 526, 665 A.2d 159, cert. denied, 235 Conn. 929, 667 A.2d 554 (1995), to support her claim to the contrary. In *Goodrum*, the police were monitoring the defendant and his brother, Moses Pipkin, for suspected drug trafficking. Id., 529. After the police observed the defendant carrying a brown paper bag and using a key to enter Pipkin's apartment building, they obtained and executed a search warrant for Pipkin's apartment. Id. They found a brown paper bag containing narcotics and an empty box formerly containing a beeper. Id., 530. The police then obtained and executed a search warrant for the defendant's apartment. Id. They found a key to Pipkin's apartment and the missing beeper. Id. Pipkin testified that he had been in the hospital for the three weeks prior to the search and that he had given the defendant the key to his apartment but he denied any knowledge of the contents of the paper bag or of any alleged drug trafficking at his apartment. Id., 531. On

the basis of this evidence, the jury found the defendant guilty of possession of narcotics with intent to sell and conspiracy to sell narcotics. Id., 528. On appeal, the Appellate Court affirmed the defendant's possession conviction but reversed the defendant's conspiracy conviction because there was insufficient evidence to establish an agreement. Id., 537, 541. The Appellate Court explained that the only evidence of a connection between the defendant and Pipkin was the key to Pipkin's apartment. Id., 539. The court held that "[t]he jury did not have to believe [Pipkin's testimony], but there was no affirmative evidence to the contrary and the jury was not free to believe the opposite." Id., 540.

Miranda Calvente argues that here, as in *Goodrum*, "[t]he only connection between [Miranda Calvente] and the drug proceeds was the [$10] marked bill in her purse" and that "[t]he state in this case presented no evidence to contradict Wilfredo [Calvente's] statement [that he alone was involved in drug activity], therefore the jury was not free to believe otherwise." We disagree with Miranda Calvente's characterization of the evidence in this case and find the facts in *Goodrum* to be distinguishable.

In the present matter, there was more evidence connecting Miranda Calvente to the drug sales and proceeds than the $10 marked bill found in her purse. First, she was present in the kitchen, where a large quantity of marijuana was being packaged for resale, when the police entered the apartment. In *Goodrum*, Pipkin was not present in the apartment with his brother when the alleged drug activity took place. Second, the state presented evidence of relatively large cash deposits made in Miranda Calvente's bank account in the year prior to her arrest. No such evidence of suspicious financial activity was introduced in *Goodrum*. Third, in the present matter, the connection to drug activity was the possession of a marked $10 bill, used earlier that

day in a drug sale conducted from the apartment and found within a large amount of cash separated and folded in a manner consistent with drug trafficking. In *Goodrum*, the only connection to drug activity was the possession of a key to a family member's apartment. Whereas the possession of the proceeds of a drug sale in such a manner is highly probative evidence of an agreement to sell drugs, the possession of a key to a family member's apartment, standing alone, is not. See, e.g., *State* v. *Sweeney*, 30 Conn. App. 550, 559, 621 A.2d 304 (sufficient evidence of conspiracy to sell marijuana where defendant knew of marijuana distribution operation conducted from apartment, purchased plastic bags used to package marijuana and knew money in her possession was proceeds of drug operation), cert. denied, 225 Conn. 927, 625 A.2d 827 (1993).

We also reject Miranda Calvente's contention that the jury could not reasonably find an agreement to sell marijuana in the present matter because the state presented no affirmative evidence to contradict Wilfredo Calvente's written statement that he alone was involved in drug activity. "Credibility is . . . a question for the trier of fact, and the trier is entitled to believe some or all of the testimony that has been presented." *State* v. *Alfonso*, 195 Conn. 624, 633–34, 490 A.2d 75 (1985). Thus, the jury was not required to believe Wilfredo Calvente's statement.[47] The question, rather, is whether there was sufficient evidence for the jury to believe that Wilfredo Calvente's statement was false and that Wilfredo Calvente or others agreed with Miranda Calvente to conduct drug activity from the apartment. As we have indicated, the state presented ample affirmative evidence contradicting Wilfredo Calvente's

---

[47] We note that Wilfredo Calvente implicitly contradicted his statement that he alone "buys, sells . . . and smokes the marijuana that the police found" by pleading not guilty to the possession of marijuana charges and by introducing witnesses and evidence in his defense.

statement and indicating Miranda Calvente's involvement in a conspiracy. Cf. id., 634 (insufficient evidence of defendant's possession of marijuana where defendant's only connection to marijuana was that it was found in common room of apartment and only one of defendant's two roommates, both of whom were not home when search was conducted, denied possession).

Finally, Miranda Calvente argues that the evidence presented at trial could be construed in a manner consistent with her innocence. We reiterate that the jury need not draw all reasonable inferences consistent with the defendant's innocence and that, on appeal, we ask "whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Garner*, supra, 270 Conn. 473. For the reasons explained previously, we conclude that the evidence was sufficient for the jury to conclude, beyond a reasonable doubt, that Miranda Calvente was guilty of conspiracy to sell marijuana within 1500 feet of a public housing project.[48]

Accordingly, the judgment of the Appellate Court in each case with respect to the charges of risk of injury to a child cannot stand. With respect to the charges of conspiracy to sell marijuana within 1500 feet of a public housing project, we conclude that the Appellate Court improperly reversed the convictions on the ground that the trial court's instructions were improper. We agree with the Appellate Court's conclusion that the imposition of separate sentences for conspiracy to sell marijuana and conspiracy to sell marijuana within 1500 feet of a public housing project would violate the double jeopardy clause of the United States constitution and

---

[48] In light of our holding that the evidence is sufficient to support Miranda Calvente's conviction for conspiracy to sell marijuana within 1500 feet of a public housing project, we necessarily hold that the evidence is also sufficient to support her conviction for conspiracy to sell marijuana.

that the conspiracy convictions of each defendant should be merged and the lesser sentences vacated.

The judgment of the Appellate Court is reversed only as to the defendants' convictions of risk of injury to a child and conspiracy to sell marijuana within 1500 feet of a public housing project and the cases are remanded to the Appellate Court with direction to reinstate the trial court's judgments of guilty of risk of injury to a child and to remand the matter to the trial court with direction to combine the two conspiracy convictions of each defendant, to vacate the respective sentences for conspiracy to sell marijuana and to sentence each defendant only on the respective convictions of conspiracy to sell marijuana within 1500 feet of a public housing project.

In this opinion PALMER, VERTEFEUILLE and ZARELLA, Js., concurred.

BORDEN, J., with whom NORCOTT and KATZ, Js., join, concurring and dissenting. I agree with and join the dissenting opinion of Justice Katz with respect to part I of the majority opinion—that the state should have been required to present expert testimony concerning the possible injurious effects of the oral consumption of raw marijuana. I would therefore affirm the judgment of the Appellate Court with respect to the defendants' risk of injury convictions. See *State* v. *Padua*, 73 Conn. App. 386, 398–99, 808 A.2d 361 (2002).

I concur with part II of the majority opinion that the Appellate Court improperly reversed the defendants' convictions for conspiracy to sell marijuana within 1500 feet of a public housing project on account of instructional impropriety because any error was harmless beyond a reasonable doubt, and that the imposition of a sentence for both conspiracy to sell marijuana and conspiracy to sell marijuana within 1500 feet of a public

housing project would violate the double jeopardy clause of the United States constitution. See id., 404, 405.

I write separately with respect to part III of the majority opinion because I concur in part. In part III A of the majority opinion, the majority addresses the issue of whether the defendant Miranda Virgilia Calvente was entitled, under double jeopardy principles, to have the Appellate Court decide her claim that the evidence was insufficient to sustain her conviction for conspiracy to sell marijuana within 1500 feet of a public housing project, when the court had already reversed the conviction for instructional error. The state has conceded this issue. Nonetheless, the majority declines to engage in the constitutional analysis and, instead invokes our supervisory authority to hold that a reviewing court must address a defendant's evidentiary insufficiency claim prior to its remand for retrial because of instructional error. The majority then evaluates the evidence supporting the conviction and concludes that it was sufficient. I agree with that conclusion reached in part III B of the majority opinion.

I disagree, however, with part III A of the majority opinion in which it invokes our supervisory authority without deciding the constitutional issue. I would decide the double jeopardy claim in the defendant's favor.[1] In other words, I conclude that, when a defen-

---

[1] We ordinarily invoke our supervisory powers to enunciate a rule that is *not* constitutionally required but that we think is preferable as a matter of policy; see, e.g., *State* v. *Reynolds*, 264 Conn. 1, 215, 836 A.2d 224 (2003) (" '[the exercise of our supervisory powers] is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole' "), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); not, as the majority does in the present case, to avoid deciding a constitutional question that is squarely presented.

dant presents a claim of evidentiary sufficiency on appeal, she is entitled by virtue of the prohibition against double jeopardy to have that claim fully considered, irrespective of whether she presents another valid appellate claim. See *Burks* v. *United States*, 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) (holding that double jeopardy clause bars retrial when reviewing court has found evidence insufficient to support guilty verdict). Put simply, if the defendant is correct in that claim of evidentiary sufficiency she may not be retried on that charge because to permit such a retrial would allow the state to try her twice for the same offense when it had adduced legally insufficient evidence to convict her in the first trial. That is tantamount to a verdict acquitting her in the first trial because, if the defendant were correct in her evidentiary insufficiency claim, she should legally have been acquitted, and the double jeopardy principle would prohibit the state from taking a second bite of the conviction apple.

Although I acknowledge that there is a split of authority on this question, I agree with those numerous authorities, both state and federal, that hold that the double jeopardy clause requires an appellate court to review a criminal defendant's insufficiency of the evidence claim prior to remanding a case for a retrial because of trial error.[2] Specifically, I disagree with the reasoning in

[2] Compare *United States* v. *Wallach*, 979 F.2d 912, 917 (2d Cir. 1992) (double jeopardy protection mandates that "a reversal of a conviction on grounds other than sufficiency does not avoid the need to determine the sufficiency of the evidence before a retrial may occur"), cert. denied, 508 U.S. 939, 113 S. Ct. 2414, 124 L. Ed. 2d 637 (1993), *United States* v. *Haddock*, 961 F.2d 933, 934 (10th Cir.) (same), cert. denied, 506 U.S. 828, 113 S. Ct. 88, 121 L. Ed. 2d 50 (1992), and *Dillon* v. *State*, 317 Ark. 384, 388, 877 S.W.2d 915 (1994) (same) with *United States* v. *Porter*, 807 F.2d 21, 23–24 (1st Cir. 1986) (relying on *Richardson* v. *United States*, supra, 468 U.S. 317, in concluding double jeopardy clause not implicated by First Circuit Court of Appeals refusal, upon determining that defendant was entitled to retrial because of trial error, to consider defendant's sufficiency of evidence claim; grant of retrial did not terminate defendant's initial jeopardy), cert. denied, 481 U.S. 1048, 107 S. Ct. 2178, 95 L. Ed. 2d 835 (1987), and *United States*

those cases that have concluded that the United States Supreme Court decision in *Richardson* v. *United States*, 468 U.S. 317, 104 S. Ct. 3081, 82 L. Ed. 2d 242 (1984), is inconsistent with the conclusion that double jeopardy principles require a reviewing court to address a defendant's insufficiency of the evidence claim regardless of a finding that trial error necessitates a new trial. *Richardson* held that the defendant could not prevail on his claim that the double jeopardy clause required a reviewing court to address his insufficiency claim where the first trial had resulted in a mistrial following a hung jury. Id., 322–23. The court reasoned that the defendant's claim "lack[ed] its necessary predicate, there having been no termination of original jeopardy." Id., 318. In its analysis, however, the *Richardson* court specifically distinguished the facts of that case from those of *Burks* v. *United States*, supra, 437 U.S. 1, in which the defendant had appealed from a final judgment of conviction, and noted that "[t]he case law dealing with the application of the prohibition against placing a defendant twice in jeopardy following a mistrial because of a hung jury has its own sources and logic." *Richardson* v. *United States*, supra, 323. Given the court's own narrow phrasing of its holding, I see no justification for extending the rule beyond the context of mistrials.

I also note that this has long been our understanding and practice, even in cases decided after *Richardson*. See, e.g., *State* v. *Jones*, 234 Conn. 324, 334, 662 A.2d 1199 (1995) (addressing defendant's unsuccessful insufficiency claim, despite concluding in same appeal that new trial was warranted because of trial error); *State* v. *Gray*, 200 Conn. 523, 535–36, 512 A.2d 217 (addressing defendant's insufficiency claim before considering claim of trial error because " 'if we were to rule that

v. *Miller*, 952 F.2d 866, 871–72 (5th Cir.) (same), cert. denied, 505 U.S. 1220, 112 S. Ct. 3029, 120 L. Ed. 2d 900 (1992).

the evidence was insufficient, the defendant would be entitled to an acquittal rather than a new trial' "), cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 376 (1986); *State* v. *Fernandez*, 198 Conn. 1, 21, 501 A.2d 1195 (1985) (addressing defendant's insufficiency claim despite having already found that trial error merited new trial because finding of insufficiency would bar retrial); see also *State* v. *Warholic*, 84 Conn. App. 767, 769 n.1, 854 A.2d 1145 (addressing defendant's sufficiency of evidence claim despite concluding that prosecutorial misconduct warranted new trial "because a determination of evidentiary insufficiency would entitle the defendant to a judgment of acquittal"), cert. granted, 271 Conn. 935, 861 A.2d 512 (2004); *State* v. *Bermudez*, 79 Conn. App. 275, 277 n.3, 830 A.2d 288 (same), cert. granted, 266 Conn. 921, 835 A.2d 61 (2003).

Finally, even if, following *Richardson*, there remains some doubt as to strict application of the *Burks* rule in the context of an appeal that presents both claims of trial error and insufficiency of the evidence, I agree with the majority that requiring review of the insufficiency claim makes sense as a matter of sound appellate policy and fundamental fairness. When a defendant challenges a conviction on appeal solely on the basis of evidentiary insufficiency, he is entitled to have the court review that claim and, if he is correct, no retrial is permitted. *Burks* v. *United States*, supra, 437 U.S. 18. If the same rule were not to apply to a defendant who presents two valid claims on appeal—one for evidentiary insufficiency and one for trial error—that defendant would be worse off than the first defendant, because he would be subject to a retrial despite the fact that the state had not adduced sufficient evidence in his first trial. That would be a bizarre result. Indeed, such a scenario would incentivize prosecutorial manipulation of the appellate process: the state, faced with two such valid claims, and recognizing the validity of

both, would be well-advised to confess error on the trial error claim and thereby gain the opportunity to fill any evidentiary gaps at the second trial that it left open in the first trial.[3] Sound appellate policy and fundamental fairness require that we structure our appellate process so as to avoid these results.[4]

KATZ, J., with whom BORDEN and NORCOTT, Js., join, dissenting and concurring. In the present case, the state had the burden of proving beyond a reasonable doubt that the defendants, Bethzaida Padua, Wilfredo Calvente and Miranda Virgilia Calvente, had created a situation that was *likely* to harm the health of a child. See General Statutes (Rev. to 1999) § 53-21 (1).[1] This court previously has established that, within the context of § 53-21, the term "likely" means "when particular

---

[3] Ironically, in such a case, the defendant's arguments in support of her claim of insufficiency may serve to assist the state to fill such gaps on retrial. See S. Wang, "Insufficient Attention to Insufficient Evidence: Some Double Jeopardy Implications," 79 Va. L. Rev. 1381 (1993).

[4] Furthermore, providing appellate review of a claim of evidentiary insufficiency, even when the defendant has presented a valid claim of trial error, is consistent with our recent reaffirmation of the waiver rule in *State* v. *Perkins*, 271 Conn. 218, 856 A.2d 917 (2004). The waiver rule dictates that when a defendant's motion for judgment of acquittal at the close of the state's case is denied, a defendant has two options: forgoing presentation of a defense and obtaining appellate review of the sufficiency of the evidence based solely on the state's presentation of its case; or presenting evidence on her behalf and obtaining appellate review of the sufficiency of the evidence based on the evidence in toto, thus risking that her presentation of her defense will have filled in gaps in the state's case. Id., 229. In *Perkins*, we recognized that the waiver rule presents a defendant with a "difficult dilemma," but not an unfair one. Id., 243. To add, however, to the difficult choice required of the defendant by the waiver rule the additional requirement that, by raising trial error claims along with a sufficiency claim on appeal, she risks that the reviewing court may elect not to address her sufficiency claim at all, compounds an already difficult choice with a fundamentally unfair one.

[1] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that . . . the health of such child is likely to be injured . . . shall be guilty of a class C felony."

subject matter will *probably* come to be or when its chances of realization are more *probable* than not." (Emphasis added.) *State* v. *Romero*, 269 Conn. 481, 491, 849 A.2d 760 (2004). Thus, the state was required to prove that harm probably would have come to the minor victims had they ingested some of the raw marijuana within their reach. The question, therefore, is whether it is such common knowledge that the ingestion of raw marijuana is likely to harm a child that the state did not have to produce expert testimony as to that fact. See *LePage* v. *Horne*, 262 Conn. 116, 125, 809 A.2d 505 (2002) ("[e]xpert testimony is required 'when the question involved goes beyond the field of the ordinary knowledge and experience' " of average juror). In part I of its opinion, the majority concludes, relying almost entirely on marijuana's illegality, that it is common knowledge that orally ingesting raw marijuana is likely to harm a child and, therefore, that no expert witness was required.

Common knowledge is limited, however, to those well substantiated facts that are obvious to the general community. See *American Tobacco Co.* v. *Grinnell*, 951 S.W.2d 420, 427 (Tex. 1997). Upon careful examination of the available resources on the subject, I would conclude that the effects of eating raw marijuana are far from obvious, largely unreported, and, to the extent that they are discussed outside the mainstream media, they are widely disputed. Accordingly, I would conclude that the state should have been required to present expert testimony concerning the possible injurious effects of ingesting raw marijuana, and, thus, I would affirm the judgment of the Appellate Court with respect to the defendants' risk of injury convictions. See *State* v. *Padua*, 73 Conn. App. 386, 398, 808 A.2d 361 (2002).

Although the concept of common knowledge plays a significant role in our jurisprudence, this court never explicitly has defined its meaning. Similarly, despite its

universal importance, very few courts outside Connecticut have endeavored to provide a standard by which to determine when a matter rises to the level of common knowledge. See G. McDonald, "The Common Knowledge Doctrine in Medical Malpractice Litigation," 16 Los Angeles Lawyer 24, 28 (May 1993) (Very little decisional law has defined common knowledge, even if many cases have dealt with its effects. Seemingly, "[c]ommon knowledge amounts to a body of unreflective wisdom or insight held by the ordinary run of humanity, gained from observation, experience, acculturation and popular education, about how peers usually conduct themselves in relation to familiar stresses and challenges in the environment."). The few jurisdictions to do so have cited the definition set forth in various editions of Black's Law Dictionary. See *Mulroy v. Western Resources, Inc.*, 97 P.3d 528, 2004 WL 2085589 (Kan. App. 2004); *Creech v. W.A. Foote Memorial Hospital*, 2004 WL 1258011, *11 (Mich. App. June 8, 2004); *Brune v. Brown Forman Corp.*, 758 S.W.2d 827, 830–31 (Tex. App. 1988); see also *Tipton v. Tabor*, 538 N.W.2d 783, 788 n.1 (S.D. 1995) (Erickson, J., concurring in part and dissenting in part) (citing Black's Law Dictionary [6th Ed. 1990] and defining common knowledge as "knowledge that every intelligent person has, and includes matters of learning, experience, history, and facts of which judicial notice may be taken"). According to the most recent edition of that dictionary, common knowledge is defined as a *"fact* that is so widely known that a court may accept it as true without proof." (Emphasis added.) Black's Law Dictionary (8th Ed. 2004). In order for something to be considered a fact, it must, at the very least, generally be accepted as true and have a basis in reality. See id. (defining "fact" as "[s]omething that actually exists; an aspect of reality"). Therefore, common knowledge is not tantamount to a common belief that may be nothing more than a perception grounded in folklore, not reality.

The fundamental distinction between that which is merely a common belief and that which is common knowledge[2] is illustrated by the following example in a book review addressing, inter alia, the flaws of eyewitness identification. See E. Loftus & E. Greene, Book Review, "Twelve Angry People: The Collective Mind of the Jury," 84 Colum. L. Rev. 1425, 1431–32 (1984). "In a recent survey over 500 people in Dade County, Florida, were asked '[d]o you think that the memory of law enforcement agents is better than that memory of the average citizen?' Fifty percent of sample answered 'yes' and thirty-eight percent said 'no.' Yet empirical research comparing police to others paints a different picture. Some researchers suggest that the police may occasionally pay special attention to particular details in their environment; for example, a clean license plate on an

---

[2] This distinction—between common beliefs and common knowledge—is consistent with this court's requirement of expert testimony regarding standard of care in negligence cases for activities commonly engaged in by the public. Although an activity may be commonplace, the average juror must have a sufficient factual basis to ascertain the standard of care in order to relieve the plaintiff of the obligation to produce expert testimony on that standard. Compare *Santopietro* v. *New Haven*, 239 Conn. 207, 228–29, 682 A.2d 106 (1996) (plaintiff required to introduce evidence to prove standard of care umpire must use in managing players' unruly behavior at amateur softball game, despite fact that it is not uncommon experience for parents to umpire their children's softball games) with *Bader* v. *United Orthodox Synagogue*, 148 Conn. 449, 454, 172 A.2d 192 (1961) (expert testimony not required to support plaintiff's claim that absence of proper porch railing was structural defect). This distinction is illustrated in *LePage* v. *Horne*, supra, 262 Conn. 117, wherein we considered whether expert testimony was needed to establish that a caregiver breached the standard of care by placing an infant on its stomach to sleep where that infant died of sudden infant death syndrome. Despite the fact that many jurors probably were parents, we concluded that an expert opinion was required because, even if the ordinary person had a general awareness of the risks associated with the prone sleep position, it was not common knowledge whether the risk of placing the infant in a prone position was appreciably greater than placing the infant in any other position. Id., 131–32. We noted that information on this matter had not been widely disseminated. Id., 128–31. We further acknowledged the common misperception that existed, until recently, that placing an infant on its stomach was the safest position. Id., 128–29.

otherwise dirty car. Studies consistently find, however, that police officers are not superior to civilians as eyewitnesses." Id., 1432. Thus, while a common belief could be nothing more than a widespread misconception, "common knowledge encompasses only those things so patently obvious and so well known to the community generally, that there can be no question or dispute concerning their existence." (Internal quotation marks omitted.) *American Tobacco Co.* v. *Grinnell*, supra, 951 S.W.2d 427. Accordingly, a common misperception is not the legal equivalent to common knowledge so as to supplant evidence necessary to establish an essential element of the state's case.

In my view, having established that the field of common knowledge is limited to obvious facts, the potentially harmful effects of orally ingesting raw marijuana can only be considered common knowledge when the question actually has been examined and the results are largely undisputed. This threshold is consistent with this court's decision in *State* v. *Clark*, 260 Conn. 813, 822, 801 A.2d 718 (2002), wherein we considered whether the trial court properly had refused to allow the jury to consider whether a witness' ability to perceive and relay events may have been impaired by smoking five marijuana cigarettes within a short time period prior to observing the defendant at the crime scene. In concluding that the effects of smoking marijuana on one's ability to perceive and relate events was a matter within the jury's common knowledge, "[w]e recognize[d] that, because it is an illegal substance, it may be that many jurors may have no firsthand knowledge regarding the effects of marijuana on one's ability to perceive and to relate events. [Nevertheless], we cannot blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or

friends. . . . The unfortunate prevalence of marijuana use, coupled with the substantial effort to educate all segments of the public regarding its dangers, underscores the reality that the likely effects of smoking five marijuana cigarettes in a short period of time before an incident are within the ken of the average juror." (Citations omitted.) Id., 824–25. Thus, the average juror would have been exposed, through observation, experience, acculturation and popular education, to sufficient facts to form a reasoned conclusion on the matter, and, therefore, expert testimony was not required. Id.

Although we concluded in *Clark* that the effects of smoking marijuana are within the common knowledge of jurors, the effects of orally ingesting raw marijuana are not similarly known.[3] The ingestion of raw marijuana is not a practice engaged in by even a statistically significant minority of the population.[4] Furthermore,

[3] The majority in the present case relies on our discussion in *State* v. *Clark*, supra, 260 Conn. 824–26, to conclude that, because the effects of eating marijuana baked in brownies are well known and, because this practice is sufficiently widespread or known in mainstream culture, the risks of ingesting raw marijuana necessarily also are common knowledge. See part I A of the majority opinion. While I would agree that expert testimony would not be required if the court were considering the harmful effects of eating brownies that have been baked with marijuana, I have uncovered no evidence, nor has the majority cited to any, that either the ingestion of raw marijuana is a relatively common practice or its effects are widely reported. Thus, in my view, the *Clark* standard cannot apply to the present case because, unlike with marijuana brownies, information on the effects of eating raw marijuana cannot be readily known through popular culture. The majority further reasons that regardless of the method of ingestion, "it is still a widely known fact that marijuana is an illegal drug that will adversely affect the recipient, whether it is smoked, baked, sautéed, infused into alcohol, brewed in a tea, eaten raw, or consumed in any other inventive manner." In my view, this is an inferential leap not warranted under, and indeed inconsistent with, *Clark*.

[4] Indeed, I question whether, prior to this case, an average juror would have contemplated that anyone intentionally would ingest raw marijuana. We recognize that there are cases in which: (1) a party has admitted to eating marijuana, but it is unclear in what form; see, e.g., *People* v. *Galambos*, 104 Cal. App. 4th 1147, 1153, 128 Cal. Rptr. 2d 844 (2002); *State* v. *Shepherd*, 110 Wash. App. 544, 552, 41 P.3d 1235 (2002); (2) a party has admitted to

the effects of eating raw marijuana have not been reported in mainstream media and are addressed only in anecdotal evidence disseminated by advocacy groups or indirectly in medical literature.[5] Indeed, within that limited sphere, there are conflicting views as to whether the ingestion of raw marijuana has an adverse effect. The only case law my research has uncovered addressing the effects of ingesting raw marijuana is an administrative decision indicating that it is not harmful. See *In the Matter of Marijuana Rescheduling Petition,* Docket No. 86-22, Drug Enforcement Administration (September 6, 1988). In that case, an administrative law judge for the Drug Enforcement Administration concluded: "In strict medical terms marijuana is safer than many foods we commonly consume. For example, eating ten raw potatoes can result in a toxic response. By comparison, it is physically impossible to eat enough marijuana to induce death. . . . Marijuana, in its natural form, is one of the safest therapeutically active substances known to man." Id., 58–59. "In layman terms

eating raw marijuana, without mention of whether the consumption had any effect on the person; see, e.g., *Caffey* v. *State,* 433 S.W.2d 900, 901 (Tex. Crim. App. 1968); and (3) a party has admitted to eating raw marijuana to avoid police detection. See, e.g., *State* v. *Miller,* 131 Wash. 2d 78, 81, 929 P.2d 372 (1997). One reasonably cannot conclude, however, on the basis of these obscure situations, either that the ingestion of raw marijuana is a widespread practice or that its effects are common knowledge. Indeed, in the one instance the majority cites when the effects of eating raw marijuana were considered, expert testimony was presented on the matter. See *Gudinas* v. *State,* 816 So. 2d 1095, 1104 (Fla. 2002) (toxicology expert testified about effect that eating raw marijuana day before and day of murder had on defendant). Similarly, even if we were to assume, without conceding, that information regarding the effects of eating raw marijuana on animals is instructive with respect to the potential effect on humans, the majority offers no reasonable basis upon which we could conclude that such information is within the ken of the average juror.

[5] The only reference I have found in medical literature is a brief mention of the dosage of marijuana necessary for a psychotropic effect. See Physicians' Desk Reference for Herbal Medicines (1st Ed. 1998) p. 712 ("[i]n most subjects the effect is registered following an oral dose of 20 mg. d-9-tetrahydrocannabinol").

. . . [a] smoker would theoretically have to consume nearly 1,500 pounds of marijuana within about fifteen minutes to induce a lethal response." Id., 58. Advocacy groups also have posted anecdotal information on the internet positing that it is not harmful. See, e.g., T. Scott ed., "The Truth Tree," at http://www.truthtree.com/marijuana_eating.shtml ("The active ingredients in cannabis . . . [are] fat and alcohol soluble . . . . Marijuana must be heated before being consumed to activate the cannabanoids so one cannot simply eat raw grass."); F. Patenaude, "An Interview with Nazariah: Veganism and the Raw Food Movement," at http://www.lifeessentials.ms11.net/anazariah.html ("[Y]ou won't get high at all if you eat raw marijuana. And a lot of . . . people can relate to that. They tried raw marijuana—eating it, and nothing happened to them. They've tried cooking it and eating it, and they did get high."); "Instinctotherapy: why it 'stincts,'" at http://www.ecologos.org/instinctotherapy.htm ("Several of my colleagues have had a go at raw Indian hemp (cannabis). One of them . . . tried a few leaves and finding them tasty, he went on eating . . . [and] nothing happened. No hallucination, no arousal, no laughing fits, nor any of the symptoms common on marijuana."); K. Valente, "Pot-heads fight back," at http://emedia.leeward.hawaii.edu/kamanao/apr_potheads.html ("The active chemical in marijuana, delta-9 tetrahydrocannabinol (THC), is found in crystal-like trichomes on the leaves of the cannabis sativa plant. In order for a person to get high, the delta-9 THC must be broken down as humans lack the enzymes to effectively make usable THC oil in its raw form. This is why simply eating marijuana will not get a person high.").

Admittedly, there also is anecdotal evidence on the internet to support the contrary view that orally ingesting raw marijuana could be harmful to a child because it induces either a psychoactive effect or sickness. See M. Litchfield, "Cannabis Consumption FAQ," at http://

www.erowid.org/plants/cannabis/cannabis_faq_con-sumption.shtml ("It is a myth that dried marijuana must be heated before being consumed to activate the cannabanoids. Many people find that raw cannabis leaves and buds can be eaten for strong effects without any pre-heating."); "Marijuana," at http://www.drugtext.org/library/books/recreationaldrugs/marijuana.htm ("Marijuana must be cooked before it is eaten or used as a recipe ingredient. Raw grass is abrasive to the stomach and can cause nausea and/or painful ulcers."); B. Julin, "Cannabis/Hemp/Marijuana Complete F.A.Q.," at http://www.totse.com/en/drugs/marijuana/162273.html ("Many populations have grown hemp for its seed—most of them eat it as 'gruel' which is a lot like oatmeal. The leaves can be used as roughage, but not without slight psycho-active side-effects."). The limited scope of this debate regarding the potential effects of eating raw marijuana and the overall lack of research I have found on the subject suggest that it is a question that rarely has been examined, and, hence, the effects of orally ingesting raw marijuana are something about which we cannot be certain. Thus, whatever conclusion the average juror might reach about the effects of ingesting raw marijuana would be based on nothing more than pure speculation.

A conclusion falls outside the field of common knowledge if it "involves obscure and abstruse medical factors such that the ordinary layman cannot reasonably possess *well-founded* knowledge of the matter and could *only indulge in speculation* in making a finding . . . ." (Emphasis added; internal quotation marks omitted.) *Gross* v. *Victoria Station Farms, Inc.*, 578 N.W.2d 757, 762 (Minn. 1998). Thus, there is a distinction between a fact that the average juror reasonably could find to be true based on the presentation of credible lay testimony during a trial, or based on their own personal knowledge, and a fact that a juror reasonably could find to

be true based only on pure speculation in the absence of expert testimony. Speculation is not the legal equivalent to common knowledge such that no evidence would need to be presented to establish an essential element of risk of injury. Accordingly, in the present case, I would conclude that the harmful effects of orally ingesting raw marijuana fall outside the field of common knowledge because the matter is so obscure.

In *State* v. *Graham*, 134 N.M. 613, 81 P.3d 556 (App.), cert. granted, 134 N.M. 723, 82 P.3d 534 (2003), the New Mexico Court of Appeals reached precisely this conclusion. In the course of a search of the defendant's home, the police found a bud of marijuana in a crib in the master bedroom and a partially smoked joint on the floor in an area that was readily accessible to the defendant's two children, who also were inside the house. Id., 616. The defendant was charged under New Mexico's child endangerment statute, which required the state to prove beyond a reasonable doubt that the "[d]efendant caused the children to be placed in a situation which endangered [their] life or health . . . ." (Internal quotation marks omitted.) Id., 617. At trial, the children's mother, the defendant's girlfriend, testified that if her children had gotten ahold of the marijuana, they "probably would have ate . . . it and got sick." (Internal quotation marks omitted.) Id., 618. Her testimony was the only link between the marijuana and a potential danger to the children. Id. The court overturned the defendant's conviction due to insufficient evidence because "[t]here was no other testimony regarding the degree of danger the drugs presented, had the children gotten [a]hold of them." Id., 619. The court noted: "The [s]tate's forensic chemist identified the drugs, but offered no expert opinion as to the marijuana's toxicity or the harm, if any, it posed to the children. The district court was not presented with evidence to determine the potential danger involved in

ingesting marijuana, although such evidence appears to exist." Id.

Similarly, the reasoning of the Texas Court of Appeals in an analogous context is illuminating. In *Brune* v. *Brown Forman Corp.*, supra, 758 S.W.2d 827–28, the plaintiff filed a wrongful death action on behalf of her daughter, who had died as a result of acute alcohol poisoning after taking several shots from a bottle of tequila, naming as defendants the companies that had manufactured, distributed and sold the tequila. The issue before the court was whether the risk of death from acute alcohol poisoning is common knowledge such that there was no duty to warn as a matter of law. Id., 831. Significantly, the court distinguished between what is common knowledge regarding the *intoxicating* effects of drinking alcohol and the relatively unknown *fatal* effects of alcohol poisoning. Id. The court explained that, "common knowledge encompasses those facts which are so patently obvious and so well known to the community generally, that there can be no question or dispute concerning their existence. For instance, there can be no dispute that there are twelve inches in a foot, that the sun rises in the morning, or even that a person drinking alcoholic beverages will become intoxicated. On the other hand, the length in inches of a particular object, the location of the sun at a specific point in time, or the level of intoxication and its effect on a particular person at a specific time, all involve facts which could be subject to dispute and which could never be ordinary common knowledge to the community. This is because a matter of common knowledge is information known by the public generally based upon indisputable facts. Therefore, the more disputable a fact may be, the less likely it will belong to that narrow set of facts judicially recognized as common knowledge. Unlike the examples cited . . . the fatal propensities of acute alcohol poisoning cannot be

readily categorized as ordinary common knowledge. Although there is no question that drinking alcoholic beverages will cause intoxication and possibly even cause illness is a matter of common knowledge, we are not prepared to hold, as a matter of law, that the general public is aware that the consumption of an excessive amount of alcohol can result in death. We realize that there is no clear line between what is and is not common knowledge, but where facts . . . show how easily disputed the knowledge of the fatal propensities of alcohol may be, we will not recognize it as common knowledge as a matter of law." Id., 830–31.

*Brune* illustrates that the consequences of one type of use of a given substance can be common knowledge while the consequences of a different type of use may remain unknown and unproven. Notably, the Texas Court of Appeals necessarily evaluated the common knowledge of jurors with respect to fatal alcohol poisoning in the late 1980s. The more recent and unfortunate rash of reporting such problems on our college campuses may now make such a matter one of common knowledge. Indeed, what is common knowledge changes over time. "As would be expected, some of the information that is now considered common knowledge would not have been considered common knowledge in generations past. There is also knowledge that was once a matter of common knowledge but can no longer fairly be considered as such." J. Bucci, "Revisiting Expert Testimony on the Reliability of Eyewitness Identification: A Call for a Determination of Whether it Offers Common Knowledge," 7 Suffolk J. Trial & App. Advoc. 1, 3–4 (2002). Perhaps at some time in the future, it will be common knowledge as to whether orally ingesting raw marijuana would cause a risk of harm to a child. Despite the fact that many people might assume, if asked, that raw marijuana would cause harm; see footnote 3 of this opinion; that conjecture is not a suffi-

cient basis upon which to relieve the state of its obligation to present evidence to prove an essential element of the crime beyond a reasonable doubt. Therefore, I would conclude that the state should have been required to present expert testimony concerning the possible injurious effects of the oral consumption of raw marijuana, and thus, I would affirm the judgment of the Appellate Court with respect to the defendants' risk of injury convictions.

Accordingly, I respectfully dissent with respect to part I of the majority opinion that reverses the judgment of the Appellate Court, which had ordered the risk of injury convictions be set aside. I concur with the majority opinion that the evidence was sufficient to sustain the defendant Miranda Virgilia Calvente's conviction of conspiracy to sell marijuana within 1500 feet of a public housing project, although I agree with and join the concurring opinion of Justice Borden with respect to the majority invoking this court's supervisory authority without deciding the constitutional issue of double jeopardy in connection with her conviction.